HANNAH G. PAYSON & another *vs.* ALICE M. BURNHAM & another.

Suffolk.    Jan. 26, 27. — May 7, 1886.    DEVENS & GARDNER, JJ., absent.

In 1824, a corporation owning a mill-dam and the tenants in common of flats lying northerly of the dam executed an indenture, which, after reciting that the owners of the flats wished to fill them up so as to fit them for buildings, and to have the right to pass therefrom over the dam, provided that a certain straight line should be drawn north of the dam; that the space between this line and the dam should be filled by the owners of the flats, but no building or fixture should be placed south of said straight line, "it being the mutual intention of the parties that the space thus filled up shall be identified with the said dam for the purposes of a highway, without any impediment or obstruction by either party to be made or procured." The indenture further provided, that the part of the highway lying between the straight line and the centre of the dam or highway should be kept in repair "for the purpose of travelling" by the owners of the contiguous lots. In 1828, the tenants in common of the flats, which had then been filled up, made partition of their lands, and a certain lot was set off to O., one of their number. In 1831, a street was laid out over the dam, but the north line was not specifically defined. In 1835, the mill corporation became the owner of the lot set off to O. In 1843, said corporation entered into an indenture with the then owners of the other lots divided by the partition of 1828, which, after reciting the indenture of 1824, and the fact that certain of the said owners of lots had erected buildings and steps south of the straight line, provided that the corporation relinquished the right to remove the structures already built, and that houses and steps might thereafter be built as far south of the line as those already built, but no further; and that no fixture of any kind other than the steps should be placed south of the front walls of said houses. In 1846, the mill corporation conveyed a part of said lot owned by it to A., and the remainder to B. Each deed contained the provision that the land was sold subject to the conditions, stipulations, and reservations relating to the erection of buildings made by the owners of the flats, but that nothing therein should be construed to require a building to be placed further north than a certain other building. In 1846–47, A. built a house on his land, conforming to the stipulated line, and fenced in a space in front of the house, and the same has been kept fenced since. In 1857, all the owners of contiguous lots fenced in similar spaces in front of their houses. In 1884, the grantee of A. began to build on the land a bay window projecting two feet and six inches in front of the south line of the house, and over the space enclosed by the fence. *Held,* that the grantee of B. could maintain a bill in equity against A.'s grantee to restrain him from continuing the window; and that the fact that the owners of other houses near by had built similar bay windows was immaterial.

BILL IN EQUITY, filed October 4, 1884, by the owners of the dwelling-house No. 88 Beacon Street in Boston, to restrain the defendants, who are the owners of the adjoining dwelling-house

on the east, No. 87, from maintaining a bay window, projecting two feet and six inches south of the front wall of their house. Both estates are situated between Brimmer Street and Beaver Street. The case was heard on the pleadings and agreed facts, by *C. Allen*, J., who reserved it for the consideration of the full court, in substance as follows:

Before the filing of the bill, and before the building of the bay window had been begun, the plaintiffs gave notice in writing to the defendants that the proposed construction was deemed an injury to the house No. 88, and a violation of the plaintiffs' rights, and that, if persisted in, resort would be had to legal remedies.

On January 26, 1824, the Boston and Roxbury Mill Corporation, being the owner of the mill-dam, now Beacon Street, entered into an indenture with Jonathan Mason and others, the so-called Mt. Vernon proprietors, who were the owners as tenants in common of the flats north of the mill-dam from Charles Street westerly, including the premises where the houses of the plaintiffs and of the defendants now stand. The material portions of the indenture are as follows:

"Whereas the parties of the second part claim to be proprietors of the flats lying north of, and contiguous to, the dam of the party of the first part, extending from the upland on the Boston side of Charles River to low-water mark, and are desirous of filling up and converting into solid land a part of the premises adjoining the north side of said dam, and of raising the same to a level therewith, so as to be fit for buildings, and to have the right of passing from the premises, or from any buildings thereon erected, upon and over said dam into the city of Boston and back again without payment of toll: now this indenture witnesseth, that the said parties, for and in consideration of the covenants herein expressed by them, respectively, to be performed with each other, hereby agree as follows:

"First. The party of the second part may proceed to fill up the flats by them owned contiguous to the north side of said dam, and to the level of the top thereof, westerly to low-water mark. . . . .

"Second. A straight line shall be drawn, beginning on the capsill of the wharf of the party of the second part, a distance of

ninety-nine feet from the line of iron posts in the south wall of the dam, and thence running parallel with said line of posts, and at the same distance therefrom, to or towards low-water mark; and the space comprehended between said straight line and the said north side of the dam shall be filled up by the party of the second part, but no building or fixture of any kind shall be placed south of said straight line; and if any such buildings or fixture shall be placed south of said line, the party of the first part may cause the same to be removed, it being the mutual intention of the parties that the space thus filled up shall be identified with the said dam for the purposes of a highway, without any impediment or obstruction by either party to be made or procured.

" Third. That part of said highway which lies between the aforesaid straight line and a line drawn along the centre of said dam or highway thus widened, and extending as far as the land thus filled up, shall be kept in like repair, for the purpose of travelling, as the part of the dam contiguous thereto, at the expense of the party of the second part, so long as they continue to be proprietors of the flats and land immediately contiguous to the dam, and afterwards by the several owners or occupants of the immediately contiguous lots for the time being, in proportion to the measurement of said lots abutting on said highway or dam, until the same shall become a public highway to be maintained at the public expense ; and in default of such repairs, it shall be lawful for the party of the first part to make the same, and to charge the same, in the aforesaid proportions, to the contiguous lots owned by the delinquents, and to recover the same at law from the owners or occupiers of such lots, when such expense shall be incurred; and it shall be lawful for the party of the first part to place against the lot or lots of any person or persons neglecting or refusing to make such repairs, or to pay their respective proportions of the expense of making the same on demand, such fence or barricade in any part of the land filled up as may prevent such owners or occupiers from access to the said dam, until such repairs shall be made, or the expense incurred by the corporation for making the same shall be refunded; and the party of the second part agrees that in all deeds of lots on said road by them to be given, a proviso shall be inserted in

reference to this article, making such lot subject to the repairs herein expressed and intended."

In 1828, the said tenants in common made partition of their lands, and a lot, which includes the premises now owned by the plaintiffs and by the defendants, was set off to Otis, one of their number. At this time, the land as far north as the straight line fixed in the second article of the above indenture had been filled to a level with the mill-dam; but it cannot now be precisely ascertained how much or what part of it was from time to time specially prepared for use as a sidewalk, or macadamized under orders of the city government. There is a space in front of the houses, now enclosed by iron fences, and extending several feet in front of the stone steps hereinafter referred to. This space has never been specially prepared for travel either as a carriageway or sidewalk, nor ordinarily used as such, although prior to 1847 it was left open and unenclosed, and was in no manner separated from the travelled part of the way. In 1831, Beacon Street was laid out over the mill-dam to a point westerly of the premises, but the north line of the street was not specifically defined, and the parties are at variance whether it did or did not include the space now enclosed by the iron fences. In 1835, the mill corporation became the owner, through mesne conveyances, of the above-mentioned lot, which was set off to Otis in the partition of 1828, and which includes the land now owned by the plaintiffs and by the defendants.

In 1843, the owners of several of the lots on Beacon Street to the easterly of what is now Brimmer Street had erected houses thereon, the front walls of which projected southerly over the line stipulated for in the indenture of 1824, and the doorsteps of which, made of stone, in many cases projected as much as seven feet beyond the fronts of the houses. On October 9, 1843, the mill corporation, being now the owner of the lot above mentioned, entered into an indenture with the several persons who then owned the rest of the premises which had been divided by the deed of partition of 1828, which, after reciting the indenture of 1824, and the partition of 1828, proceeded as follows:

" And whereas it is provided in said last-named indenture that no buildings or fixtures of any kind shall be placed upon said

land, flats, or wharf, between a street called A Street* on said plan and the sill at the western limit of said wharf, south of a line in said last-named indenture particularly described, and that said corporation may remove any building or fixture placed south of said line; and the front or south wall . . . . † dwelling-houses since then built and now standing on said lands or wharf between the streets aforesaid are placed south of the line aforesaid, and the front door-steps to said houses project several feet south of said line, contrary to the stipulations and covenants in said last-named indenture contained ; . . . . and whereas the several persons, parties hereto of the second part, are seised and possessed in common with said corporation of a strip or parcel of flats not divided in the partition above mentioned and hereinafter fully described, and have agreed to convey the same in fee unto said corporation, and said corporation in consideration thereof has agreed to relinquish the right to interfere with and remove said wall of said dwelling-houses above mentioned, and the steps in front thereof, conferred upon said corporation by said last-named indenture, in the manner hereinafter relinquished, and to relinquish . . . . † right therein conferred to remove any buildings or fixtures that may be placed upon any portion of said land and wharf first above named, south of the line aforesaid, as is hereinafter relinquished: . . . . now, therefore, this indenture witnesseth, that the said Boston and Roxbury Mill Corporation, in consideration of the premises and of one dollar to them paid, the receipt of which is hereby acknowledged, do hereby forever relinquish, release, and surrender all the right, power, and authority they now have or ever had, under and by virtue of the indenture above named, to remove the walls or any part of the walls of the dwelling-houses, or of the steps, or any part thereof, in front of said houses heretofore built and now standing on the land and wharf first above named, on the said north side of Beacon Street, now owned by any of said persons, parties of the second part hereto, or their assigns, or by the assigns of the persons whose estate said persons of the second part hereto represent, which is or are placed south of the

---

* This street is now called River Street.
† A portion of the page in the record is here torn away.

line provided in said above-named indenture, to be drawn ninety-nine feet distant and north of the iron posts of the fence or railing upon the south wall of the mill-dam, or Western Avenue, so called, and parallel therewith, and that said corporation do as fully forever relinquish, release, and surrender all said corporation's right, power, and authority, conferred or derived as aforesaid, to remove any wall or any steps that may hereafter be placed in the stead or place of said walls now existing, and said steps now existing in front of said walls of said houses, and that may hereafter be placed upon the lands or wharf, owned as aforesaid, west of said houses, to the same extent and in the same manner that the walls and steps of said houses are now placed and exist over, beyond, and south of the line aforesaid, described in said indenture, to whomsoever said houses or said land and wharf may now belong. Provided, however, that nothing herein contained shall be understood to authorize any walls to be placed or put further south of the said line upon any portion of said land or wharf between said A Street and the sill of said wharf than the walls of said houses now stand and the line of said walls continued to the sill of said wharf, nor to place any steps beyond said walls, on the line thereof continued as aforesaid, further south than those now built in front of the above-mentioned houses extend on any portion of said lands or wharf between the limits aforesaid, nor to place any fixture of any kind, other than steps as aforesaid, south of the front walls of said houses on the line thereof continued as aforesaid between the limits aforesaid, nor be construed to be any relinquishment or surrender of the right, power, and authority derived or conferred as aforesaid to remove such walls, steps, or other fixtures placed further south than the same are above expressly authorized to be placed, contrary to the meaning and intent of said above-mentioned indenture."

By a deed dated July 1, 1846, the mill corporation conveyed the premises now owned by the defendants to Andrew T. Hall, under whom the defendants now hold their title, together with the privileges and appurtenances unto the granted premises belonging. The deed describes the land as twenty-five feet westerly from the land of David Sears, "on which a brick house has recently been erected," and contains the following provision: "Said

tract of land is, however, sold and conveyed subject to the conditions, stipulations, and reservations heretofore made by the Mt. Vernon proprietors relative to the erection of buildings thereon, with which said Hall hereby agrees to comply in all respects; but nothing heretofore done by said proprietors shall be construed to require any buildings to be placed on said Beacon Street . . . . further north than the line of said brick house on said Sears's land continued, or to prevent the placing of steps for the front door of any house built on said granted land extending as far south of the walls of such houses as the steps of said house on said Sears's land now extend beyond the wall of said last-named house." There was also a covenant in the deed, that the premises were " free from all incumbrances, saving those above referred to, contained in the agreements of the Mt. Vernon proprietors."

Contemporaneously with the above deed, the mill corporation conveyed the premises now owned by the plaintiffs to Sidney B. Morse, under whom the plaintiffs now hold their title, by a deed substantially similar in form to the deed to Hall. Each of these deeds contained a reference to the other, as made on the same day.

In 1846–47 Hall built a dwelling-house on his land, and in 1847 fenced in a space in front of the same, including all the land over which the defendant's bay window extends; and the same has since been kept fenced. In 1852, the plaintiff's house was built, the front steps of which projected about seven feet south of the line of the Sears house, and about four and a half feet beyond the line of the defendants' bay window, and have been so maintained ever since. In 1857, all the lots on Beacon Street between Brimmer Street and Beaver Street having been covered with houses, said houses having stone door-steps projecting several feet in front of them, the existing iron fences were erected, of a similar pattern, a few feet farther south than the front of the steps, upon existing stone foundations, by the several owners. The same man was employed to do the work by each owner.

At various dates from 1846 to the present time, numerous bay windows have been placed on the fronts of the houses from Charles Street to the defendant's house, many extending a greater

distance south than the bay window of the defendants. These projections, together with the front walls and door-steps of said houses, have been maintained without expressed objection, so far as known, on the part of the owners of lots conveyed by the deed of partition of 1828. The plaintiffs have never made any objection to the maintenance of the fences and the door-steps in front of said houses.

*R. Olney & H. H. Sprague*, for the plaintiffs.

*A. S. Wheeler & E. W. Hutchins*, for the defendants.

C. ALLEN, J. At the argument, the main reliance of the defendants was upon the position that the right reserved upon the land south of the contemplated line of buildings was merely for a way or street; that the use of it for a way or street was long since abandoned, as is shown by the erection and maintenance of the door-steps and fences; and that all the subordinate or incidental rights or privileges in the nature of easements, such as of prospect, light, and air, were also abandoned.

This argument, if valid, would seem by implication to assert the right of the defendants to build over the whole enclosed space in front of their house, without liability to restraint at the suit of the plaintiffs.

We do not find it necessary to determine whether, taking the indenture of 1824 by itself alone, the restrictions and prohibitions therein contained were intended merely to be incidental to the use of the front space as a travelled way or street. It clearly was contemplated that the land should be divided up into lots, and be owned by different proprietors. In 1843, when the second indenture was entered into, the situation had changed. Buildings had then been erected, the front walls of which projected beyond the line theretofore fixed, and stone door-steps projected several feet beyond the front walls of the houses. The mill corporation had become the owner of the lots upon which the dwelling-houses of the plaintiffs and of the defendants now stand. By the second indenture, a modified front line was fixed, the front walls of houses and the door-steps as then existing were sanctioned, and others were allowed to be built extending equally far to the south; and there was an express proviso against any farther extension, and also against placing any fixture of any kind, other than steps as aforesaid,

south of the front walls of said houses, on the line thereof continued as aforesaid.

It is impossible to consider these new provisions as merely incidental to the use of the space in front of the houses as a street or way, because the stone steps already existing, and permitted to be built in the future, would prevent such use, at least as far as they extended. It must therefore be considered that the several owners at that time had in mind a method or system of building which should prevent any other projections in the future, not as incidental to the use of the space immediately in front of their houses as a travelled street or way, but on account of the other benefits which were contemplated as the result of conforming to such a common plan. The form in which this purpose was expressed was that of an indenture between the mill corporation, on the one side, and various owners of lands under the partition of 1828, on the other side. But the corporation no longer had any special interest in the mill-dam or street in front of these estates, and it had itself become the owner of an estate under that partition, and was bound, as such owner, by the stipulations in the indenture of 1824, so far as they were for the benefit of adjoining estates. Thus the indenture of 1843 was in reality between owners of lands under that partition. Under this state of things, the indenture of 1824, as modified by that of 1843, being still in force, Hall, the defendants' predecessor in title, accepted his deed in 1846, in which he expressly agreed to comply in all respects with the conditions, stipulations and reservations theretofore made by the Mt. Vernon proprietors relative to the erection of buildings thereon. This, if nothing had been added, would have bound him to the observance of the requirements of the original indenture of 1824. Accordingly, there was a further provision, that nothing theretofore done by said proprietors should be construed to require any buildings to be placed further north than the line of said brick house on said Sears's land continued, or to prevent the placing of steps for the front door of any house built on said granted land extending as far south of the walls of such houses as the steps of said house on said Sears's land then extended beyond the wall of said house. This allowed to Hall the same rights as those contemplated in the indenture of 1843. Here, then, there was an express stipulation, in 1846,

binding Hall to the observance of a line in building, which was clearly defined. The adjoining estate, conveyed on the same day to Morse, was plainly included in the benefits of this stipulation. The house built by Hall immediately afterwards conformed to this stipulation. The fencing in of the space in front of the house did not interfere with that portion of the street which was then used for travel. No question is here presented relative to the right of maintaining fences as they now exist. No complaint on this score has ever been made. But taking the indenture of 1824, as modified by that of 1843, in connection with the deed to Hall in 1846, we cannot come to any other conclusion than that, at the latter date, Hall, the defendants' predecessor in title, bound himself to the observance of the stipulations into which he entered, as part of a building scheme, for the benefit of each estate affected by it, and not limited to the use of the land in front of the houses as a way; and that the obligation into which he then entered is, on principles often stated and now well settled, enforceable against the present defendants by the present plaintiffs. *Beals* v. *Case*, 138 Mass. 138. *Peck* v. *Conway*, 119 Mass. 546. *Parker* v. *Nightingale*, 6 Allen, 341, 346–348. *Whitney* v. *Union Railway*, 11 Gray, 359, 363.

The fact that other bay windows have been erected without expressed objection does not cut off the plaintiffs' right to object to one which injuriously affects them. According to the plan used at the hearing, there was no other bay window so near to the plaintiffs' house as to interfere with their prospect, or to afford the least presumption of a waiver by them.

*Decree for the plaintiffs.*