# Edwin A. Landell Jr., Ella Willard Higgons and the Philadelphia Trust, Safe Deposit & Insurance Company, Trustee for Leah Laurette Willard, Appellants, *v.* Matthew Hamilton and Herman Diesinger.

*Deeds—Covenants running with the land—Equity.*

In equity, the test by which to determine whether a covenant in a deed runs with the land is the intention of the parties; to ascertain such intention, resort must be had to the words of the covenant read in the light of the surroundings of the parties and the subject of the grant.

Where a building restriction is still of substantial value to a dominant lot, notwithstanding the changed use of the land and buildings, equity will restrain its violation if relief is promptly sought.

In 1831 H. was the owner of three adjoining lots of ground on the south side of Chestnut street near Twelfth in the city of Philadelphia. All of the lots extended to Sansom street. In that year the neighborhood was confined to residences. It is now exclusively given up to business. On each of the two outer lots H. built a three and one-half story brick house, covering the entire front, the main buildings extending back fifty-one feet, then back buildings for dining room and kitchen two stories high extending sixty-six feet further back, five feet six inches narrower than the main building, leaving that width between the walls of the buildings and the lines of the middle lot. He also built a house on the middle lot, the main building being the same as the other two, with no back building, the kitchen being in the basement, the windows looking south towards Sansom street. In 1832 H. conveyed both the eastern and western lots for the consideration of $19,000 for each lot, with the condition, "That no building or part of a building, other than steps and railings, cellar doors, door frames, window shutters, eaves and cornices, shall hereafter be built or erected on the said hereby granted lot of ground within five feet of the south line of the said Chestnut street. And the said H., for himself, his heirs, executors, administrators and assigns, doth hereby covenant, promise and agree to and with the said grantee, his heirs and assigns, that the house on the lot of ground adjoining to the west of the hereby granted lot;

now belonging to the said H. shall be forever restricted from having any building or part of a building attached to the said messuage thereon erected of a greater height than ten feet from the surface of the yard." Later in the same year, H. conveyed the middle lot for the consideration of $16,000, " under the condition, nevertheless, that no building, other than steps and railings, cellar doors and door frames, window shutters, eaves and cornices, shall hereafter be built or erected on the said hereby granted lot of ground within five feet of the south line of the said Chestnut street; and subject to the condition that the house on the lot of ground hereby granted is and shall be forever restricted from having any building or part of a building attached to the said messuage now erected thereon of greater height than ten feet from the surface of the yard." In the warranty clause, it was declared it was " under the condition and subject as aforesaid." In 1895 defendants acquired title to the middle lot, and proposed to erect thereon a building one hundred feet high extending from Chestnut street to Sansom street. The plaintiffs, the owners of the adjoining lots, filed a bill to restrain them. *Held*, that taking the surroundings of the parties at the date of the conveyances by H., the subject of the contract, the purpose of it and the words of it, it was intended to place a restriction upon the middle lot running with the land for the benefit of the outer lots, which should forever prevent the obstruction of light and air by buildings higher than ten feet to the rear of the main building: Columbia College v. Thacher, 87 N. Y. 311; Page v. Murray, 46 N. J. Eq. Rep. 325; Jewell v. Lee, 96 Mass. 145, distinguished.

Argued April 3, 1896.   Appeal, No. 202, Jan. T., 1896, by plaintiffs, from decree of C. P. No. 2, Phila. Co., Sept. T., 1895, No. 551, refusing injunction.   Before STERRETT, C. J., McCOLLUM, MITCHELL, DEAN and FELL, JJ.   Reversed.

Bill in equity for an injunction, to restrain the erection of a building on an alleged servient lot.

The facts appear by the opinion of the Supreme Court.

The court refused an injunction.

*Error assigned* was decree refusing injunction.

*Henry K. Fox, Charles C. Lister* with him, for appellants.— Any words indicating the intention of the parties create a covenant running with the land: Paschall v. Passmore, 15 Pa. 307; Cromwell's Case, 2 Coke, 71*a*; Hartung v. Witte, 59 Wis. 285; Batley v. Foerderer, 162 Pa. 460.

While at common law it would be necessary to make an inquiry as to the relative difference between a condition and a

covenant, yet equity goes directly to its substantial elements and inquires what duty does it assure, and to whom? Clark v. Martin, 49 Pa. 297.

Equity will give effect to the intention and spirit of the restriction by restraining any impairment of the light and air: Muzzarelli v. Hulshizer, 163 Pa. 646; Ivory v. Burns, 56 Pa. 300; St. Andrew's Church App., 67 Pa. 512; Bald Eagle Valley R. R. v. Nittany Valley R. R., 171 Pa. 284; Wray v. Lemon, 81* Pa. 273; Philips' App., 93 Pa. 50.

The restriction in Orne v. Fridenberg, 143 Pa. 502, while not expressing in terms its purpose, was for light and air. This purpose was found by the master, and was admitted in the argument of the appellants. The case, however, did not turn on this point, but expressly on the question of laches: Groff v. Turnpike Co., 144 Pa. 152.

The deed of the party to be bound must be taken most strongly against him: Beeson v. Patterson, 36 Pa. 27; Miner's App., 61 Pa. 283; Klaer v. Ridgway, 86 Pa. 534.

Keate v. Lyon L. R., 4 Ch. App. 218, lacked the element of mutual covenants, and therefore the motion was refused.

Peck v. Matthews, L. R. 3 Eq. 517, is no more an authority for defendants' position than is Orne v. Fridenberg, for, in the former case, the breaches of covenant on the general plan of improvements had taken place, as to other properties than that included in the bill, a long time previously, and the court held that the covenantee under such circumstances could not enforce his covenant against a new purchaser, for it could only be partly performed.

Roper v. Williams, Turner & Russell's Reports, 18, resembled Peck v. Matthews and our own case of Orne v. Fridenberg, in that, having slept on its rights and permitted violations of the covenant, the plaintiff's action in equity should be and was dismissed.

Duncan v. Railway Co., 85 Kentucky, 525, was where it was agreed that "no business, manufacturing, or other than dwelling houses" should be built upon the lot and no building should front except in a particular way. After the sale of the particular lot the plan was abandoned and adjacent lots were sold without restriction, thus rendering it impossible for the appellant to carry out his plan, thus abandoned, and the injunction was refused.

In Dana v. Wentworth, 111 Mass. 291, GRAY, J., distinguished the plaintiff's case from that in which the covenant was for the benefit of the grantee or his assigns, and the case differed from the case in point in that the plaintiff could not show that she was the owner of any land which might be affected by a disregard of the restriction.

*John G. Johnson, Julius C. Levi* with him, for appellee.—It amounts to nothing to urge, as the appellants do, that the restriction has not been questioned for sixty-four years.   The reason therefor is very apparent.   It is admitted by the appellees that no building of greater height than ten feet could have been attached to the structure which was upon their lot at the time the restriction was imposed.   As the old building has remained until the present time, the restriction, of course, continued to be operative.   No building can be erected, under the appellees' interpretation of the restriction, so long as the old structure remains.

We submit, that the fact that the appellants have enjoyed for sixty-four years light and air by reason of the restriction, renders somewhat strange the argument of their counsel to the effect that under the appellees' interpretation no benefit could ensue to them.   For sixty-four years, because of the fact that it was not deemed advantageous to destroy the old building, the appellants have enjoyed the light and air given to them by the original restriction.   This, however, is no reason why they shall enjoy the benefit of what was never given qua a building now about to be erected.

The question is not what may have been in the minds of the parties, though the answer to this question, in our judgment, would be, that they contemplated only that for which they provided, i. e., an attachment to the old building.   The real question is, what did they agree upon?   What is the ordinary and proper construction of the words which they used?   Did they mean to restrict the use of more than three fourths of a lot when they merely provided that there should be an attachment to a building which was then in existence?

The case of National Plate Glass Insurance Company v. Prudential Insurance Company, L. R. 6 Ch. D. 757, is interesting in that it shows that the English doctrine of ancient lights pro-

tects only the lights of a building theretofore erected, or of one practically substituted for the first. It does not protect the lights of a new building of a different character from the old.

It is not necessary for us to appeal to the doctrine that courts of equity will not enforce restrictions imposed by reason of a certain situation after such situation has changed. The inclination of the court would be to permit a valuable improvement to be made, not to prevent the same, even though the words were clear. In the absence, however, of clear words, and under a restriction merely against building an attachment to an old building, this court will hardly feel inclined to stand in the way of improvement and to destroy the value of the appellees' property.

OPINION BY MR. JUSTICE DEAN, May 4, 1896:

In the year 1831, William Hause, being the owner of a lot of ground on the South side of Chestnut street, between Twelfth and Thirteenth streets, fronting on Chestnut seventy-four feet and extending back to Sansom street two hundred and thirty-five feet, divided it into three lots, giving the middle and western lot, each, a frontage on Chestnut street of twenty-five feet, and the eastern one twenty-four feet on the same street, all extending back at right angles to Sansom street. On each of the two outer lots, he built a three and a half story brick house, covering the entire front; these main buildings extending back fifty-one feet eleven inches; then, back buildings for dining room and kitchen, only two stories high, but extending sixty-six feet further back; these back buildings, however, were five feet six inches narrower than the main building, leaving that width between the walls and the lines of the middle lot. He also built a house on the middle lot, the main building being the same as the other two, but with no back building, the kitchen being in the basement, the windows looking south towards Sansom street.

On March 24, 1832, Hause conveyed both the eastern and western lots to Lindsay Nicholson and Rebecca H. Willing, for the consideration of $19,000 for each lot. In the deeds was this condition:

" Under the condition, nevertheless, that no building or part of a building, other than steps and railings, cellar doors, door

frames, window shutters, eaves and cornices, shall hereafter be built or erected on the said hereby granted lot of ground within five feet of the South line of the said Chestnut Street. And the said William Hause, for himself, his heirs, executors, administrators, and assigns, doth hereby covenant, promise and agree, to and with the said Lindsay Nicholson, his heirs and assigns, that the house on the lot of ground adjoining to the West of the hereby granted lot; now belonging to the said William Hause, shall be forever hereafter restricted from having any building or part of a building attached to the said messuage thereon erected of a greater height than ten feet from the surface of the yard."

The numbers of these two lots are 1206 and 1210. The title to 1206 by regular conveyances, all duly recorded, and embodying the condition, became vested in plaintiff, and in 1888 that of 1210 became vested in George Allen for the consideration of $125,000.

On November 10, 1832, Hause, for the consideration of $16,000, conveyed the middle lot, 1208, to one Stewart, under whom defendants claim. In that deed, after mentioning that the lot is bounded east by 1206 and west by 1210, is inserted the following condition:

"Under the condition, nevertheless, that no building, other than steps and railings, cellar doors and door frames, window shutters, eaves and cornices, shall hereafter be built or erected on the said hereby granted lot of ground within five feet of the South line of the said Chestnut Street; and subject to the condition that the house on the lot of ground hereby granted is and shall be forever restricted from having any building or part of a building attached to the said messuage now erected thereon of greater height than ten feet from the surface of the yard."

In the warranty clause, it is declared it is, "Under the condition and subject as aforesaid."

There seems to be no doubt that, in the intervening sixty-three years between 1832, the date of the first conveyance, and 1895, when defendants took their title, the owners and occupants of the middle lot had, in some particulars, failed to keep within the strict terms of their conveyance. Structures had been put upon the Sansom street end of the lot, higher than the limit prescribed in the deed; and some of the buildings on the lot in

rear of the main building were of a height slightly in excess of the allowable ten feet from the surface; but no hostility to right of plaintiff was intended, and there was no substantial interference with the light and air enjoyable by 1206 and 1210 from a practically unobstructed middle lot free from high buildings.

The defendants, the last purchasers of the middle lot, are about to take down the old house erected in 1832, with the view of putting upon it a building one hundred feet high, extending from Chestnut to Sansom, formerly George street. The plaintiffs file this bill to restrain them, alleging that such a structure will be a palpable violation of their right under the covenants in the prior deeds of their common grantor.

The defendants admitted the facts as we have stated them, but denied that the building they intended to put up was an illegal violation of the restriction. Further, they averred, the character of the locality had wholly changed since 1832, when the restriction was first imposed; at that time, that part of Chestnut street was taken up by residences; now it is devoted to business.

The court below refused to enjoin defendants, and plaintiffs appeal.

We are of opinion, the issue turns wholly on the interpretation of the covenant in the deed of March 24, 1832, from Hause to Nicholson for lot 1206. The grantor covenants for himself, his heirs and assigns, with the grantee, his heirs and assigns, " that the house on the lot of ground adjoining to the West of the hereby granted lot, now belonging to the said William Hause, shall be forever hereafter restricted, from having any building or part of a building attached to the said messuage, thereon erected, of a greater height than ten feet from the surface of the yard." Then the subsequent conveyance of the middle lot imposes on that grantee and his assigns subserviency to the restriction in favor of the grantees of the east and west lots.

Does the covenant run with the land? If so, the power of the owner of the land, out of which he carved three lots, to burden the middle one with such a continuing covenant, cannot be questioned. It has been decided, as will be noticed from the cases hereinafter cited, that in equity the test by which to deter-

mine whether a covenant in a deed runs with the land is the intention of the parties. To ascertain the intention, resort must be had to the words of the covenant read in the light of the surroundings of the parties and the subject of the grant.

It is argued, in substance, that a covenant running with the land, so manifestly prejudicial to the enjoyment of the middle lot, could not have been intended by the grantor; that the reasonable construction is, the obligation under it terminates with the removal of the house then upon the middle lot.

That this covenant, if a perpetual burden, now most vexatiously restricts the owner of 1208 in the enjoyment of the property, and very greatly depreciates its value, may be conceded; and if such result had appeared imminent at the date of the conveyance, this argument would, perhaps, not have been without weight. It will be noticed that, notwithstanding the restriction, the consideration for the middle lot in 1832 was $16,000, and for each of the others $19,000; the owner seems to have received, in enhanced value of the two outside lots, by reason of the additional back buildings and the benefits accruing to them from the restriction in their favor on the middle one, $6,000. He, doubtless, at that day, assumed this sum represented the value of the relative advantages and disadvantages to the lots created by the restriction. But he did not foresee the comparatively near future any more than we see ours. In our bargains, to the extent we judge probable, we provide for and guard against proximate future contingencies; as to the very remote, or what appears to us the very remote, we are indifferent. The serious effect of the restriction, now, after the comparatively short period of sixty years, as affecting the enjoyment of the middle lot, even if his intention had been to hold it for himself and heirs, was not thought probable by him or any other lot owner of that period. The present values of real estate in the present Philadelphia may have been thought possible in a couple of centuries, but not sooner. They knew the growth of the city in the preceding century and a half of its existence, and that it had then reached a population of less than two hundred thousand, but they had no reason to believe that, in the next half century, the population would reach more than a million, and that new methods of communication and travel would then have placed other millions practically as close to them as was Lan-

caster county then.  They bargained on a knowledge of their future no more limited than ours as to our future, only much more limited than ours of theirs, because we are looking backward.  Not one of us would hesitate to place a perpetual burden on land we expected to hold, in favor of land we wanted to sell, if thereby a present decided pecuniary benefit resulted, and no serious depreciation was probable in that held, for a century or two.  To us, with no laws of entail, and no particular passion for perpetuating family landed estates in city lots, that period suggests to the mind a practical "forever," and so it probably appeared to Hause, when he burdened what he kept to enhance the price of what he sold.  It was not an absurdly bad bargain, tending to negative the intention of a continuing covenant, but was merely such an ignorance of a phenomenal future as exists where men of good business capacity sell land one year which enhances in value, in some instances the next year, one or two hundred per cent; of course, they would not have sold if they had known, or had reason to believe, such appreciation probable, and Hause would not have placed the restriction on the middle lot if he had thought it probable that without it the lot would appreciate in value an average of twenty per cent annually, besides yielding the interest on his original investment.  Considering the surroundings, we see nothing in the historical fact of the growth in value and change of use of unincumbered lots to negative the intention of the grantor, as indicated by his words.

And this intention is only the more clear when we consider the subject of the contract.  He had built the three houses with a view to such a restriction; by the character of the structures, he intended the middle lot should be servient to the other two; for the depth of the main buildings they should be equal, but, from these back, the east and west lots should be dominant. The middle shall have no building higher than ten feet erected upon it; for this one he provides a basement kitchen, so that the lot is unobstructed for all three main buildings to the rear.  What was the purpose in having the lot thus unobstructed?  Manifestly that, as thus arranged by him, all three should enjoy light and air.  He then conveys the two outer lots with an expressed intention conforming to the structures; these last measured the extent to which the dominant lots

should "forever" enjoy light and air, at the same time did not exclude the occupant of the main building on the middle one from a like benefit; the latter's right to the enjoyment of the surface of his lot, for building purposes, is alone restricted. The parties were not dealing about houses as houses, but concerning the future enjoyment of land, with light and air, as affected by the plans and size of houses or buildings which were then or might be thereafter erected upon it. The word used, "forever," is not one appropriate to the limited existence of a house or other building, but to the durability of land. The expression, if intended only to restrict while the then house stood, is scarcely less awkward than, if, intending to restrict only during the life of the first grantee, the grantor had said, " And during the life of the said Lindsay Nicholson, the said Hause and his assigns shall be forever hereafter restricted." A word is used emphatically expressive of a continuance beyond the duration of a life or the existence of an artificial structure, which, if simply omitted, would have indicated the intent claimed by appellees.

The purpose to afford air and light to the dominant lots could only be accomplished by an unlimited, as to time, restriction; and there is nothing to indicate that a change in the nature of the occupancy should affect the expressed right under the covenant. It is probable that deprivation of air is less endurable to the occupants of a dwelling, than to those of a store or factory; and generally the latter are less disposed to resist such deprivation; but these elements promote the health and comfort of one class of occupants as fully as the other, and both have the same right to insist on a restriction for their protection. No such change in the use of the land as appears here has ever been held destructive of the original covenant in any of the adjudicated cases in this state; nor, in our opinion, can such judgment be sustained on sound legal principles.

Taking the surroundings of the parties at the date of the conveyance; the subject of the contract; the purpose of it, and the words of it, we are of the opinion, it was intended to place a restriction upon the middle lot, running with the land, for the benefit of the eastern lot, which should forever prevent the obstruction of light and air by buildings higher than ten feet to the rear of the main building.

As long as such restrictions are not unlawful, it is to no pur-

pose to argue, that they seriously retard the improvement of the city. We can no more strike down by decree a lawful restriction creating an easement, than we can compel the lot owner to erect buildings in accord with the best style of architecture. Contracts such as this, whether construed as covenants or conditions, since Spencer's case, have been enforced, both at law and in equity, between the immediate parties to them and their grantees, near and remote. And whether they be personal to the grantor, or be limited to a period less than "forever," depends on the intention of the parties, as expressed in the written instrument: Clark v. Martin, 49 Pa. 297; Muzzarelli v. Hulshizer, 163 Pa. 646; Bald Eagle Valley R. R. Co. v. Nittany Valley R. R. Co., 171 Pa. 284.

We concede, some of the cases decided in other states are in apparent conflict with our decision. But what this court has uniformly held, and now holds, is, that where the restriction, notwithstanding the change of use of the land and buildings, still is of substantial value to the dominant lot, equity will restrain its violation, if relief, as here, is promptly sought. There may be and doubtless will occur cases where the restriction has ceased to be of any advantage. In such cases, equity would not interpose and retard improvements, simply to sustain the literal observance of a condition or covenant. And three of the cases relied on by appellees are of this very character, and therefore clearly distinguishable from the one before us: In Columbia College v. Thacher, 87 N. Y. R. 311, the agreement was between owners of dwelling houses, that one of them would not erect, carry on or establish any stable, school-house, engine house, community house, or any kind of a manufactory, trade or business whatsoever on the land. His grantees opened up and carried on many kinds of business in violation of the original covenant. The purpose of the covenant was, manifestly, to secure privacy and freedom from noise in the dwelling houses. But, by the construction of an elevated railroad, its desirability for dwellings had been practically destroyed; privacy and quiet could no longer be enjoyed; the court refused to enjoin the use of the land for business and manufacturing purposes, because, by the change consequent upon the construction and operation of the railroad, the purpose of the restriction had been defeated. Equity would not lend its aid to the enforce-

ment of a mere legal right, where no damage resulted to plaintiff from nonenforcement.

In Page v. Murray, 46 N. J. Eq. Rep. 325, the restriction was to protect the land from cheap tenement buildings, and encourage its occupation by a superior class of residents. To this end, it provided that, for a period of twenty years, no building should be erected costing less than $3,000, and no hotel, tavern, lager beer saloon, livery stable, etc., should be erected thereon. In the meantime, buildings of a low class had been erected in all the surrounding neighborhood. The purpose to make the land desirable for another class of occupants was thereby defeated, and this, together with the fact that the twenty years term had nearly expired, induced the court to refuse an injunction to restrain violation of the condition. The court would not enjoin that which could not damage the plaintiff.

In Jewell v. Lee, 96 Mass. 145, there was a condition in the grant, that the land bordering on the ocean should be used for no other purpose than access to the water for bathing and boating, and low bath houses. It was held, from the facts in that case, that the intention of the grantor was to create a restriction in favor of adjoining land which he continued to hold; that, as this land had passed to other grantees in separate lots, they could not insist on a restriction personal to the original grantor, and the court says : " Where it is apparent, the condition was annexed to a grant for the purpose of improving or rendering more beneficial and advantageous the occupation of the estate granted, when it should become divided into separate parcels, and be owned by different individuals, or when the manifest object of the restriction on the use of an estate was to benefit another tract adjoining to or in the vicinity of the land on which the restriction is imposed," equitable relief will be afforded.

Not one of these cases is in conflict with our decision here ; on the contrary, they support it. While cases are cited which support the contention of appellee, the weight of authority is the other way, and we see nothing to induce us to depart from the settled rulings on this question, as announced in our own cases already cited.

The decree of the court below refusing an injunction is reversed, and injunction is awarded as prayed for in plaintiff's bill. It is further ordered that appellees pay the costs.