## CASTLEMAN et ux. v. AVIGNONE et al.

(Court of Appeals of District of Columbia. Submitted January 4, 1926. Decided April 5, 1926.)

No. 4292.

**1. Estoppel ⚖➔63.**

Plaintiffs *held* not estopped by conduct from obtaining relief against violation of building line restrictions.

**2. Appeal and error ⚖➔1009(1).**

In injunction suit, findings of trial justice ought not be set aside, unless error in law or an unwarranted conclusion of fact appears.

**3. Covenants ⚖➔69(2)—Agreement establishing building line restriction held not mere personal covenant, binding only original signers.**

Agreement between predecessors in interest of parties to injunction suit, establishing building line restrictions, *held* not a mere personal covenant, binding only on original signers.

**4. Covenants ⚖➔49.**

Restrictions on free use and enjoyment of real estate are not favored, but when reasonable, and not against public policy, will ordinarily be enforced.

**5. Covenants ⚖➔84—Building restrictions imposed as part of scheme for improvement of tract of land, will be enforced against grantees of original signers.**

Where certain building restrictions are part of general scheme for improvement of lands in certain tract, equity will under proper circumstances enforce such restrictions against grantees of original signers.

**6. Covenants ⚖➔51(2)—That one of parties to agreement establishing building line restriction conveyed property before recording of agreement held not to affect mutuality of agreement.**

That a trustee, one of original signers of agreement establishing building line restriction, conveyed his property before agreement was recorded, *held* not to preclude holding that contract was mutually binding.

**7. Covenants ⚖➔72.**

Changed conditions *held* not to render inequitable enforcement of mutual agreement establishing building line restrictions.

**8. Covenants ⚖➔72—Zoning Commission Act held not to nullify agreement between property owners fixing building line restrictions (Act March 1, 1920, 41 Stat. 502, § 10).**

Zoning Commission Act March 1, 1920, under which commissioners had declared property involved to be in a first commercial district, *held* not to nullify a prior agreement between property owners establishing building line restrictions, in view of section 10 thereof.

Appeal from Supreme Court of District of Columbia.

Suit by Natale Avignone and others against Alfred Castleman and wife. Decree for plaintiffs, and defendants appeal. Affirmed.

W. G. Gardiner and J. W. Tomlinson, both of Washington, D. C., for appellants.

A. A. Alexander and F. H. Ridgway, both of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, VAN ORSDEL, Associate Justice, and GRAHAM, Presiding Judge of the United States Court of Customs Appeals.

GRAHAM, Acting Associate Justice. This was a bill in equity, filed by the appellees, Natale Avignone, Corinne Avignone, his wife, and Ramona Sellhausen, against the appellants, Alfred Castleman and Rebecca Castleman, his wife. The facts disclosed on the hearing below, and upon which the bill is based, are substantially as follows:

On June 10, 1897, Mary I. McAllister, John Sherman, trustee, Catherine C. Dolloway, Edward Dolloway, Mason N. Richardson, Hattie Richardson, Ellen S. Du Bois, Charlotte A. Richardson, Charles W. Richardson, Susie Richardson, Mary B. Mills, and George M. Mills signed, sealed, and severally acknowledged a certain instrument in writing, which, less the signatures and acknowledgments, is as follows:

"This agreement, made this 10th day of June, 1897, by and between Mary I. McAllister (widow), party of the first part, John Sherman, trustee, party of the second part, Catherine C. Dolloway and Edward Dolloway, her husband, party of the third part, Mason N. Richardson, Hattie Richardson, Ellen S. Du Bois, Charlotte A. Richardson, Charles W. Richardson, and Susie Richardson, parties of the fourth part, and Mary B. Mills, party of the fifth part, and George H. Mills, her husband, owners of lots as below: Party of the first part, lots 46 and 54; party of the second part, lots 45, 47, 48, 49, 50, 51, 52 and 53, McAllister subdivision; parties of the third part, owners of lots 31, 32, and 33, Commissioners' subdivision; parties of the fourth part, owners of lot 24, Commissioners' subdivision; party of the fifth part, owner of the north one-half of lot 23, all of lots 25 and 26, and the south one-half of lot 27, Commissioners' subdivision, in block eight (8), of the Commissioners' subdivision known as Washington Heights—in the District of Columbia, and recorded in Book

County No. 6, page 115, February 1, 1888, and being desirous that a building line shall be established at a certain distance back of the front line of above-mentioned lots, agree to the following restrictions, that is to say: The front of any building erected upon the said lots shall conform to a building line (hereby established by this agreement), seven and one-half (7½) feet from the front line of said lots upon Eighteenth Street; that is to say, the front line of each and every house erected upon any of said lots, and parts of lots, shall be seven and one-half feet back of the front line of said lots: Provided, however, that nothing in this agreement shall prevent the erection of bay windows, steps, or other projections that are now allowed or hereafter to be allowed upon streets of ninety (90) feet in width by the building regulations of the District of Columbia; such steps and projections to conform in all respects to said regulations. Now, therefore, the said parties hereto, for themselves, their heirs, executors, and administrators, do hereby covenant and agree and promise each to the other, his heirs, executors, and administrators, to this agreement."

This instrument in writing was duly recorded June 30, 1899. The said parties were then the sole owners of said premises, which comprised a strip of land 525 feet in length and 92 feet in depth along the east side of Eighteenth Street (N. W.) in the District of Columbia; the north line of said tract being 122.91 feet south of Columbia Road.

On July 15, 1904, a plot was recorded by the owner thereof, subdividing lots 24, 25, 26, and the south half of lot 27, of said premises, into, from south to north, lots 90 to 99, inclusive, each of said lots being 17.5 feet in width. At the time the agreement heretofore quoted was executed and recorded, there were no buildings upon the premises covered thereby, and no buildings were erected thereon until title to the lands had passed from the signers to others. Since that time a further subdivision of lots 31, 32, and 33 has been made. About 25 years ago the first houses were built on this 525-foot strip, and others have been erected since, until, at the time the bill herein was filed, all the lots in the territory in question were improved, and were numbered, south to north, from 2413 to 2471, inclusive.

On July 24, 1917, the appellants purchased lot 98, being the premises now known as 2433 Eighteenth Street, from one William E. Horton. The deed of conveyance executed and delivered to them recited: "Subject

to the condition that no building shall be erected upon said lot within 7½ feet of the front line thereof on Eighteenth Street, except bay windows, steps, or other projections allowed by building regulations of the District of Columbia."

The title of appellants came through sundry mesne conveyances from Mary B. Mills, one of the parties to the original agreement. All conveyances in the chain of title contained the restrictive clause in question, except one, a conveyance from Franklin T. Sanner to Charlotte Dailey, made September 3, 1904, which contained no reference thereto. Appellees Natale Avignone and Corinne Avignone purchased lot 96 (also known as No. 2429 Eighteenth Street) July 27, 1920, from one Francesca Sorivi; the deed of conveyance to them containing a similar clause to that heretofore quoted as appearing in the title deed of appellants. The title to this lot descended by sundry mesne conveyances from the said Mary B. Mills; each conveyance in the chain of title containing a restrictive clause, except one, dated September 28, 1908, from Marion Dorsel to Pauline Gusdorf.

The subdivision of lots 24, 25, 26, and the south half of lot 27, namely, lots 90 to 99, inclusive, was improved by substantial brick buildings of similar exterior, three story and basement type. One lot, 17.5 feet in width, separates the properties of appellants and appellees. At the time the circumstances occurred which caused the filing of the bill herein, appellant Alfred Castleman was a cabinet maker and resided with his family at No. 2433, which he used both for business and residence purposes. The appellees Natale Avignone and Corinne Avignone then resided at 2429, using the same for a residence and conducting a pastry and confectionary store on the first floor. The appellee Ramona Sellhausen is a cestui que trust in a trust deed dated June 3, 1921, upon said last-named premises, to secure a loan of $4,000.

On July 11, 1921, appellant Alfred Castleman filed an application in the office of the building inspector of the District of Columbia and obtained a permit to make certain improvements upon his said premises, including the construction of a new show window and certain other minor changes, it not being proposed, however, in this application, to build out the front walls. Thereafter, on August 5, 1921, he made application for certain changes in his permit, these changes consisting of an extension of his building to the front lot line, with a show window further ex-

tending from this to a distance of 3 feet. Work upon these changes started about July 29, 1921. Immediately after the issuance of the second permit, on August 5th, work was started on the foundation of the new extended side walls.

The appellees thereafter, on August 19, 1921, filed their bill herein, praying for an injunction against the further construction of said building beyond the building line described in the said agreement of June 10, 1897, and for a mandatory injunction to remove the portion already built. At the time the writ of temporary injunction was served upon appellants, the new front of appellants' building had reached the height of about 15 feet and the side walls 23 or 24 feet.

The other facts will be hereinafter stated as they become material.

The appellants answered the bill of complaint. On hearing, a decree was entered, granting relief in conformity with the prayer of the bill, and from that decree appellants bring the cause here.

The appellants do not contend that the agreement of June 10, 1897, was invalid, or one which the parties thereto might not make, or one which, under some circumstances, might not be enforceable. But it is argued, under the facts established by this record, it should not be enforced in equity, for four reasons, namely: First, the appellees are estopped by their acts from obtaining the relief they seek here; second, the agreement of June 10, 1897, was a personal covenant between the original signers thereof, and does not bind appellants; third, the character of the neighborhood has so changed as to render inequitable the granting of the relief sought; lastly, the Zoning Commission Act of March 1, 1920, has superseded and nullified said agreement.

[1] If the appellees, by their conduct, induced the appellants to believe that a compliance with the conditions of the said agreement would not be insisted upon, and with full knowledge of the facts stood by and permitted valuable and costly improvements to be made, while it was within their power to prevent this, then it must be conceded equity ought not to interfere. Whether the appellees are so estopped can be determined only by a consideration of the facts shown by the record.

The appellants purchased lot 98 on July 24, 1917. Their title deed contained a restrictive clause fixing a building line in conformity with the original agreement. At that time all of the lots in the 525-foot strip included in the original agreement were improved with buildings, all of which, about 30 in number, including appellants' building, had been built with their front walls in conformity with the original restrictive agreement. This condition continued to exist up until the time appellants began their building operations under their permit of July 11, 1921. It is apparent, therefore, that, when appellants applied for their permit to repair, they did so with full notice of the agreement, and with the further knowledge that all the parties thereto and their successive grantees, including their own grantor, had sedulously adhered thereto.

Appellants especially rely upon certain conversations claimed to have been had with the appellee Natale Avignone, prior to and during the time of building, in and by which they contend the said Avignone impliedly consented to the violation of the building line restriction. Avignone and his wife are Italians, both of whom speak and understand the English language but imperfectly. It is apparent, from an examination of their testimony in the record, that neither of them might be expected to understand fully any thought expressed in English, the language of which was involved or technical. The appellant Alfred Castleman stated that he had a conversation with Natale Avignone in May, 1921, in which Avignone "talked me into build a nice place"; that thereafter he employed an architect, Benjamin F. Meyers, to whom he showed his deed, and who thereupon told him he could "do it"—that is, build out. A few days before the permit of July 11, 1921, was applied for, Meyers and Castleman went to Avignone's place of business and talked with him. Meyers and Castleman testify that in this conversation they told Avignone how far they were going to "come out" with the building, and indicated this to him by holding a ruler in a perpendicular position on the sidewalk, and to which Avignone assented. Avignone testifies that the conversation was restricted to) a discussion of the new front Castleman was to put in, including show windows, and that he expressed the view that he should like to change his front and put in show windows, "like the Velati's on Fourteenth Street."

After reading the record carefully, we cannot escape the conclusion that Avignone, at least, understood this conversation as referring to a new front and new show windows, which Castleman proposed to build, and which would not at all violate the building line restriction. If, as Meyers and Castle-

man insist, the purport of this conversation was a consent on the part of Avignone that the building might be extended to the lot line, it appears remarkable that the building permit thereafter applied for by them did not propose any such extension. It was only after all the preliminary work had been done, including much of the excavations, that they applied, on August 5th, for a permit to build out to the line, of the issuance of which permit they did not inform Avignone. Castleman also testified that, after the front pier on the north wall was about 4 or 5 feet high, he had a conversation with Avignone, in which Avignone was admiring some tapestry brick in the wall, and making no objection to the building. Avignone admits having such a conversation about August 16, but states it was about some loose brick in a pile; that the side walls were then just started, and that this was the first knowledge he had appellants intended to build out. He thereupon at once communicated with an attorney, Mr. Ridgeway, who, with his associate, Mr. Alexander, came that afternoon and looked at the work. As soon thereafter as a bill for injunction could be prepared and filed, work was stopped by a temporary injunction.

These are the facts relied upon by appellants to constitute an estoppel. In our opinion, they fall far short of so doing. There is here made no such clear and convincing showing that the appellee Natale Avignone stood by and acquiesced in the violation of the restrictive agreement by the Castlemans as to raise the bar of laches against him. Much less may it be said to create a bar against his joint tenant, Corinne Avignone, or the cestui que trust, Ramona A. Sellhausen, parties appellee herein. The rule is well stated in Henshaw v. Bissell, 18 Wall. 255, 271 (21 L. Ed. 835):

"An estoppel in pais is sometimes said to be a moral question. Certain it is that to the enforcement of an estoppel of this character, such as will prevent a party from asserting his legal rights to property, there must generally be some degree of turpitude in his conduct which has misled others to their injury. Conduct or declarations founded upon ignorance of one's rights have no such ingredient, and seldom work any such result. There are cases, it is true, where declarations may be made under such peculiar circumstances, that the party will be estopped from denying any knowledge of his rights; but these are exceptional, and do not affect the correctness of the general rule as stated."

[2] In addition to what has been said, it should be observed that the trial justice heard the witnesses in this controverted matter. His finding ought not to be set aside, unless it appears that there has been an error in law or a conclusion of fact unwarranted by the evidence. Snow v. Snow, 270 F. 364, 50 App. D. C. 242.

[3] It is next argued that the building line restriction in the agreement of June 10, 1897, was a personal covenant, does not run with the land, and is not binding upon the appellants.

[4] Restrictions upon the free use and enjoyment of real estate are not favored by the law. But when restrictions are made, which are reasonable and not against public policy, they will ordinarily be enforced. Landell v. Hamilton, 34 A. 663, 175 Pa. 327, 34 L. R. A. 227; German v. Chapman, 7 Ch. Div. 271; Coughlin v. Barker, 46 Mo. App. 54; Virginian R. Co. v. Avis, 98 S. E. 638, 124 Va. 711; McNeil v. Gary, 40 App. D. C. 397, 46 L. R. A. (N. S.) 1113. And this is the rule, although the restrictions may be permanent. Jackson v. Stevenson, 31 N. E. 691, 156 Mass. 496, 32 Am. St. Rep. 476; Rowland v. Miller, 34 N. E. 765, 139 N. Y. 93, 22 L. R. A. 182; Hutchinson v. Ulrich, 34 N. E. 556, 145 Ill. 336, 21 L. R. A. 391; Hamlen v. Werner, 11 N. E. 684, 144 Mass. 396; Hopkins v. Smith, 38 N. E. 1122, 162 Mass. 444; Allen v. Barrett, 99 N. E. 575, 213 Mass. 36, Ann. Cas. 1913E, 820. Building lines are within the class of such enforceable restrictions. Hamlen v. Werner, supra; Sanborn v. Rice, 129 Mass. 387; Codman v. Bradley, 87 N. E. 591, 201 Mass. 361; Trout v. Lucas, 35 A. 153, 54 N. J. Eq. 361; Stevenson v. Spivey, 110 S. E. 367, 132 Va. 115.

[5] The written agreement of June 10, 1897, recites that the signers thereof, "being desirous that a building line shall be established at a certain distance back of the front line of above-mentioned lots, agree to the following restrictions." Obviously, this was a plan, commonly agreed upon by the owners of these lands, for the mutual benefit of their respective holdings. The general and well-established rule is that, where certain restrictions are a part of a general scheme or plan for the benefit and improvement of all the lands included in a certain tract, courts of equity will, under proper circumstances, enforce such restrictions at the suit of any grantee against any other such grantee. Chevy Chase Land Co. v. Poole, 48 App. D. C. 400; Jackson v. Stevenson, supra; Batchelor v. Hinkle, 104 N. E. 629, 210 N. Y. 243; Amerman v. Deane, 30 N. E. 741, 132 N. Y. 355,

28 Am. St. Rep. 584; McClure v. Leaycraft, 75 N. E. 961, 183 N. Y. 36, 5 Ann. Cas. 45; Rowland v. Miller, supra; Stevenson v. Spivey, supra. In such cases, as is said in Trout v. Lucas, supra: "The equitable right of action seems to be dependent as much on the fact of the general scheme as on the covenant."

There is nothing to indicate in the case at bar that the restriction in question was intended to apply only as between the original signers and their immediate grantees. In fact, the opposite may fairly be inferred. On June 30, 1899, they caused it to be recorded. This was notice to all the world of the restrictions it contained. Ewertsen v. Gerstenberg, 57 N. E. 1051, 186 Ill. 344, 51 L. R. A. 310; Trudeau v. Field, 38 A. 162, 69 Vt. 446. The condition was inserted, also, in the deed by which appellants took title.

[6] It is argued that John Sherman, trustee, one of the original signers, conveyed his property before this agreement was recorded, and that therefore the agreement ought not to be held to be mutually binding. It is sufficient to state, as to this proposition, that neither the appellants nor the appellees derive their title from Sherman, and that those who did so derive their title observed and complied fully with the conditions of the covenant, thus recognizing it as valid. Such a construction as argued for by appellants, which would destroy a condition as soon as there had been one transfer of the fee, would leave such condition to the option of the grantee, instead of the grantor, and could only be justified by plain words, which were not used in the case before us. Cincinnati Louisville Theatre Co. v. Masonic (C. C. A.) 272 F. 637.

In McNeil v. Gary, 40 App. D. C. 397, 46 L. R. A. (N. S.) 1113, this court, speaking through Robb, J., said: "Equity enforces contracts and covenants in regard to property entered into between prior grantors and grantees, in regard to the use of property, especially if common property or property descending from a common source, against subsequent owners affected with actual or constructive notice of such contracts and covenants."

The underlying principle in such cases was well expressed in Trustees of Columbia College v. Lynch, 70 N. Y. 440, 26 Am. Rep. 615, where it was said: "Although the covenant, when regarded as a contract, is binding only between the original parties, yet, in order to give effect to their intention, it may be construed by equity as creating an incorporeal hereditament (in the form of an easement) out of the unconveyed estate, and rendering it appurtenant to the estate conveyed; and when this is the case, subsequent assignees will have the right and be subject to the obligations which the title or liability to such an easement creates."

Such agreements or covenants, although merely personal in their nature, and not purporting to bind assignees, will nevertheless be enforced against assignees, unless they have a higher and better equity as bona fide purchasers without notice  Whitney v. Union Ry. Co., 11 Gray (Mass.) 359, 364, 71 Am. Dec. 715. It is not essential that they be covenants running with the land. Trustees of Columbia College v. Thacher, 87 N. Y. 311, 41 Am. Rep. 365; Coughlin v. Barker, 46 Mo. App. 54, 62. And they have been enforced against a grantee with notice, even when his deed of conveyance does not recite the condition, or when some of the conveyances from the original holder fail to recite the same. Stevenson v. Spivey, supra; Ewertsen v. Gerstenberg, supra; Hutchinson v. Ulrich, supra; Simpson v. Mikkelsen, 63 N. E. 1036, 196 Ill. 575; Landell v. Hamilton, 34 A. 663, 175 Pa. 327, 336, 34 L. R. A. 227.

From a consideration of the facts and the law, we must conclude the restrictive agreement of June 10, 1897, was and is binding upon appellants, as assignees, unless the remaining reasons urged by appellants lead us, equitably, to a different conclusion.

[7] The next contention made by appellants is that the character and condition of the lands involved in the covenant of June 10, 1897, have been so changed as to make inequitable an enforcement of the building line agreement. The record discloses that, when the restrictive agreement of June 10, 1897, was signed and recorded, the territory covered by it was vacant and unimproved. Eighteenth Street (N. W.), upon which it fronts, was 90 feet in width from lot line to lot line, with a roadway 50 feet in width and 20 feet allotted to sidewalk space on each side. There was at that time an electric trolley line operating on Eighteenth Street (N. W.) in front of the premises in question, running from the downtown section to Chevy Chase. It does not appear from the record in this case just when the first buildings were erected upon the 525-foot strip, but it does appear that none were built until after the recording of the restrictive agreement, that all conformed with the building line fixed by the

same, and that all the lots were improved by buildings prior to 1917; the ten houses, Nos. 2417 to 2435, being located on lots 90 to 99, inclusive, having been built immediately after October 8, 1904. It is said these buildings did not comply with the restrictive agreement, in that the line of the front walls thereof varied from 7 to 7.07 feet from the lot line. This was a substantial compliance, and is sufficient. Ewertsen v. Gerstenberg, supra; Brigham v. Mulock, 70 A. 185, 74 N. J. Eq. 287; Payson v. Burnham, 6 N. E. 708, 141 Mass. 547.

At the time the various buildings were erected on the property in question, they were planned and built as residences, and were for a time thereafter used as such. The record in this case is not very satisfactory as to the character of the changes that have occurred. It appears, however, that buildings built between the south side of the restricted area and Belmont Road have practically conformed with the restriction, while two buildings on the north end, and at and near the intersection of Eighteenth Street (N. W.) and Columbia Road, one of which is occupied by a drug store, have been built out to the lot line. Business has encroached to some extent upon this territory, which was once used exclusively for residences. The fronts of some of the buildings have been remodeled, but just how extensively and when does not appear. In some cases grass plots occupy the reserved space in front of the buildings, while in others the sidewalks have been widened and extend to the front of the buildings. Business has generally increased in the neighborhood. Across the street from the restricted area the buildings are out to the lot line, and on the southwest corner of Columbia Road and Eighteenth Street (N. W.) a large moving picture theater has been built and maintained. A double car track electric line extends along Eighteenth Street, and this street is the principal highway for traffic between the downtown and northwesterly parts of the city. Upon these facts, appellants argue it would be inequitable to longer enforce the restrictive agreement.

The rule in such cases is well stated in Ewertsen v. Gerstenberg, supra, as follows: "Equity will not, as a rule, enforce a restriction, where, by the acts of the grantor who imposed it or of those who derived title under him, the property, and that in the vicinage, has so changed in its character and environment and in the uses to which it may be put as to make it unfit or unprofitable for use if the restriction be enforced, or where to grant the relief would be a great hardship on the owner and of no benefit to the complainant, or where the complainant has waived or abandoned the restriction, or, in short, it may be said that where, from all of the evidence, it appears that it would be against equity to enforce the restriction by injunction, relief will be denied, and the party seeking its enforcement will be left to whatever remedy he may have at law." To a like effect are the following cases: Roth v. Jung, 79 N. Y. S. 822, 79 App. Div. 1; Page v. Murray, 19 A. 11, 46 N. J. Eq. 325; Roper v. Williams, 1 Turn. & R. 18; Duke of Bedford v. Trustees, 2 Mylne & K. 552; Sayers v. Collyer, 24 Ch. Div. 180; Scharer v. Pantler, 105 S. W. 668, 127 Mo. App. 433; Trustees of Columbia College v. Lynch, supra.

Examining the facts in the light of these authorities, we cannot conclude that the appellants have brought themselves within the rule. It will first be observed that the restrictive agreement here does not, on its face, appear to be a covenant pertaining alone to residence properties. What was in the minds of the signers thereof can only be conjectured, and, if known, must yield to the language used by them. The agreement refers to "the front of any building" and the "front line of each and every house," apparently interchangeably. This language is broad enough to include both business and residence properties, and for aught that appears in the instrument may have been so intended. One of the grantees of these original covenanters now insists upon his right to have this building line preserved for any and all purposes. We are unable to see, from anything that appears of record here, why he may not properly do so, and invoke the aid of a court of equity to enforce his right. It has been well said: "The change in the use of the buildings on the street since the execution of the indenture does not affect the plaintiff's right. The importance of the maintenance of a building line may be as great when buildings are used for purposes of business as when they are occupied only as dwellings." Codman v. Bradley, 87 N. E. 591, 201 Mass. 361.

In Zipp v. Barker, 57 N. Y. S. 569, 40 App. Div. 1, the court, in commenting upon a somewhat similar situation, said: "We might assume that originally the covenant had relation to the condition of the property at that time and that the coparceners had no thought of its coming change; but it is dif-

ficult to see why the maintenance of the easement is not more essential to the value of the plaintiff's property as business premises than it would be if it were used as a residence."

In support of their view of this matter, counsel for appellants cite Trustees of Columbia College v. Thacher, supra; McClure v. Leaycraft, supra; Amerman v. Deane, 30 N. E. 741, 132 N. Y. 355, 28 Am. St. Rep. 584; Roth v. Jung, supra; Ewertsen v. Gerstenberg, supra; Jackson v. Stevenson, 31 N. E. 691, 156 Mass. 496, 32 Am. St. Rep. 476; Deeves v. Constable, 84 N. Y. S. 592, 87 App. Div. 352, and Batchelor v. Hinkle, supra. On examination of these authorities, it will be found that the covenant in each case expressly pertained to dwelling houses or residences, and that in each case the occupancy of the premises as dwellings had become impossible, because of changed conditions.

[8] Finally, it is contended that the enactment by Congress of the Zoning Commission Act, approved March 1, 1920 (41 Stat. 500), under which act the commissioners have declared Eighteenth Street (N. W.) to be a first commercial district, must be held to nullify the restricted building line fixed by the covenant of June 10, 1897, and to release the various owners of lots in said restricted area from the obligations thereof. That such was not the intent of Congress plainly appears from the language of a portion of section 10 of said act:

"This act shall not abrogate or annul any easements, covenants, or other agreements between parties: Provided, however, that as to all future building construction or use of premises where this Act or any orders or regulations adopted under the authority thereof impose a greater restriction upon the use of buildings or premises or upon height of building, or requires larger open spaces than are imposed or required by existing law, regulations, or permits, or by such easements, covenants, or agreements, the provisions of this act and of the orders and regulations made thereunder shall control." (The italics are ours.)

Conceding, for the sake of argument, the authority of the zoning commission to make an order relative to the building line in question, it does not appear to have done so. The point made, therefore, by appellants, would seem to be not well taken.

For the reasons given, the decree of the court below is affirmed, with costs.