**MAYS et al. v. BURGESS et al.**

No. 8831.

United States Court of Appeals
District of Columbia.

Argued Nov. 14, 1944.

Decided Jan. 29, 1945.

EDGERTON, Associate Justice, dissenting.

———◇———

Mr. James A. Cobb, of Washington, D. C., with whom Mr. George E. C. Hayes, of Washington, D. C., was on the brief, for appellant Mays. Mr. Reuben Bonnett, of Washington, D. C., was on the brief for appellant Consolidated Properties, Inc.

Mr. Henry Gilligan, of Washington, D. C., for appellees.

Before GRONER, Chief Justice, and MILLER and EDGERTON, Associate Justices.

GRONER, C. J.

The case involves the validity of a deed of sale to a house and lot in the City of Washington. The appeal is from a judgment of the District Court setting aside the deed and enjoining appellant Mays from the use and occupancy of the property. The suit arose out of a covenant under seal which recites that—

"Whereas the said parties hereto desire, for their mutual benefit, as well as for the best interests of the said community and neighborhood, to improve in any legitimate way and further the interests of said community and neighborhood;

"Now, Therefore, in consideration of the premises and the sum of five dollars each to the other in hand paid, the parties hereto do hereby mutually agree, promise and covenant, each with the other and for their respective heirs and assigns, that no part of the land now owned by the parties hereto, a more definite description of said property being given after the respective signatures hereto, shall ever be used or occupied by, or sold, conveyed, leased, rented or given to Negroes or any person or persons of the Negro race or blood. This covenant shall run with the land and bind the respective parties hereto, their heirs and assigns, for the period of twenty-one years from and after the date of these presents;"

The covenant is dated September 1, 1925, is signed by three of the four plaintiffs, and is recorded in the land records of the District of Columbia, and accordingly has about a year and seven months to run before expiration by its terms. Appellant Mays, on February 17, 1944, purchased the property known as 2213 First Street, Northwest, from one Jane Cook, presumably a white person, and described as a "straw" party, who in turn had purchased it from appellant, Consolidated Properties, Inc., expressly for reconveyance to Mays.

The District Court found the facts to be that the grantor in the deed to Cook is a Delaware Corporation, engaged in the purchase and sale of real estate in the District of Columbia, and that the grantee Mays, who purchased through Cook, is a citizen of the United States and a colored person; that the plaintiffs in the suit, who are the appellees here, are white persons and the owners of homes in the same block on First Street, between Adams and W Streets, Northwest; that appellant Mays purchased the property with actual as well as constructive notice of the restrictive covenants, and that all of the adjacent area for six blocks on First Street is likewise covered by similar covenants and is occupied exclusively by persons of the white race. Based on these findings, the District Court adjudged the covenant to be valid and enforceable.

On this appeal it is argued that the judgment should be reversed—(1) because the character of the neighborhood has so changed as to render the original purpose unenforceable; (2) the covenant constitutes an undue and unlawful restraint on alienation; (3) the covenant is not binding on the appellants, who are the successors in interest of the original covenantors, because of lack of privity; and (4) it is contrary to public policy and violates the Constitution of the United States, particularly the Fifth and Fourteenth Amendments and Section 1 of the Thirteenth Amendment and the statutes enacted thereunder, particularly R.S. §§ 1977, 1978 and 5508, 8 U.S.C.A. §§ 41, 42, 18 U.S.C.A. § 51.

The case has been well briefed and well argued, and we have given it our best consideration; but we are unable to find anything in the points we are asked to consider which we have not heretofore considered and decided adversely to appellants' contentions. As long ago as 1924, in the case of Corrigan v. Buckley, 55 App. D.C. 30, 299 F. 899, we were called on to decide as to the constitutional validity of an identical covenant, and likewise whether such a covenant should be declared to be against public policy. We held in favor of the validity of the covenant and against the claim that its provisions were contrary to public policy. On appeal to the Supreme Court,[1] it was held that neither the constitutional nor statutory questions relied on as grounds for the appeal had any substance or color of merit, or afforded jurisdictional basis for the appeal. In the intervening twenty years the question under similar facts has arisen in at least five additional cases;[2] and in the last named of these, the Hundley case, which was decided less than two years ago, we said that, in view of the consistent adjudications by this court that a covenant against Negro ownership or occupation is valid and enforceable in equity by way of injunction, it must now be conceded to be the settled law in this jurisdiction. This is also true in Maryland, where as recently as 1938 the Court of Appeals of that State in Meade v. Dennistone, 173 Md. 295, 196 A. 330, 114

---

[1] Corrigan v. Buckley, 271 U.S. 323, 46 S.Ct. 521, 70 L.Ed. 969.

[2] Torrey v. Wolfes, 56 App.D.C. 4, 6 F.2d 702; Russell v. Wallace, 58 App. D.C. 357, 30 F.2d 981, certiorari denied 279 U.S. 871, 49 S.Ct. 512, 73 L.Ed. 1007; Cornish v. O'Donoghue, 58 App.D.C. 359,

30 F.2d 983, certiorari denied 279 U.S. 871, 49 S.Ct. 512, 73 L.Ed. 1007; Grady v. Garland, 67 App.D.C. 73, 89 F.2d 817, certiorari denied 302 U.S. 694, 58 S.Ct. 13, 82 L.Ed. 536; Hundley v. Gorewitz, 77 U.S.App.D.C. 48, 132 F.2d 23.

A.L.R. 1227, after discussing all the questions argued here, reached the same conclusion announced by us in Corrigan v. Buckley, supra. Unless, therefore, we are prepared to reverse and annul all that we have said on this subject, and to destroy contracts and titles to valuable real estate made and taken on the faith of our decisions, it follows that the only question now open for discussion is whether, under the rule announced in Hundley v. Gorewitz, supra, the purpose of the restrictive condition has failed by reason of a change in the character of the neighborhood, so that its enforcement would impose a hardship rather than a benefit upon those who were parties to its terms. In the last mentioned case we said [77 U.S.App.D.C. 48, 132 F. 2d 24]:

"This exception to the rule is applicable in the case of a covenant such as we have here when, in the natural growth of a city, property originally constructed for residential purposes is abandoned for homes of more modern construction in more desirable locations, for a serious decline in values would follow unless the way was open either for use of the property for business purposes or for the housing needs of a lower income class. And it is also applicable where removals are caused by constant penetration into white neighborhoods of colored persons. For in such cases to enforce the restriction would be to create an unnatural barrier to civic development and thereby to establish a virtually uninhabitable section of the city. Whenever, therefore, it is shown that the purpose of the restriction has been frustrated and that the result of enforcing it is to depreciate rather than to enhance the value of the property concerned, a court of equity ought not to interfere."

█ Applying this statement of the rule to the facts in this case, it is easily seen from the trial court's finding of facts that at this time no such change or transformation in the character of the property has occurred.[3] No colored people occupy any property in the particular block with which we are concerned, nor in the block adjacent thereto on First Street in either direction. Indeed, there is no colored occupancy on First Street from T Street north to the Soldiers' Home Grounds, nor on or to the east of First Street for several blocks, although in blocks to the west of First Street, and separated by an alley, there has been extensive colored penetration. And it may be that in a short time this penetration will reach the territory we are discussing, since, as we were told at the argument, the restrictive covenant on the adjoining block expired November 1, 1944, and the same doubtless may be said of the block in which appellant Mays' purchase was made, when the covenant as to it expires a little more than a year from now. But for the present it is enough to say that First Street, between U and Adams, and the neighboring properties eastward are an unbroken white community of nearly a thousand homes, under restrictive agreements, most of which are still in effect. From this it is clear the rule in the Hundley case as to change in the character of the neighborhood is not now applicable here. From this it follows that the judgment below was in all respects correct.

█ In this disposition of the case we have again carefully considered the argument that the covenant, if otherwise valid, constitutes an undue and unlawful restraint on alienation. It is quite true as to this point that, following the old case of Mandlebaum v. McDonnell,[4] there are to be found cases in two or three of the States which hold void any and all restraints on

---

[3] "The area adjacent to the property here in question is residential in character, consisting of row houses, a few business houses and several churches. All of First Street, Northwest, on both sides, from Rhode Island Avenue North to Channing Street, consisting of six city blocks (Channing Street being the most northerly street developed) is occupied solely by persons of the White race, all of said blocks being under Restrictive Agreements or deed covenants prohibiting the ownership, use or occupancy by Negroes. An action is pending covering 2 lots in the 2100 block of First Street, N. W., the Agreement expiring November 1, 1944. All of the intersecting streets from First Street eastward to Lincoln Road, south to the North side of T Street, and west to First Street, Northwest, including also North Capitol Street, are likewise solely occupied by persons of the White race and under similar Restrictive Agreements or deed covenants;—a total of approximately one thousand homes, churches and business properties.

"The area west of First Street and Rhode Island Avenue, N. W. is occupied almost exclusively by persons of the Negro race or blood, * * *"

[4] 29 Mich. 78, 18 Am.Rep. 61.

alienation, but the doctrine in these cases has been consistently denied in this and in other jurisdictions,[5] and the weight of authority is opposed to the doctrine. Thus, in the Colorado Springs case,[6] involving a covenant against the use of land for the sale of intoxicating liquors, the Supreme Court said:

"Repugnant conditions are those which tend to the utter subversion of the estate, such as prohibit entirely the alienation or use of the property. Conditions which prohibit its alienation to a particular person or for a limited period, or its subjection to particular uses, are not subversive of the estate: they do not destroy or limit its alienable or inheritable character."

The case we have comes clearly under the latter portion of this classification. However, it is said that the covenant does not run with the land because it was not included in a conveyance, i. e., between parties in privity, and since none of the defendants in this suit were parties to the original covenant, they are not bound thereby. Thus, a distinction is sought to be drawn between a covenant contained in a conveyance made by the parties thereto and one made by the agreement of persons owning separate parcels of adjoining property. But the distinction is without legal effect, for it confuses covenants enforceable at law with those which give rise to rights enforceable in equity.[7] This was recognized by the Maryland Court of Appeals in the case of Meade v. Dennistone, supra.

In the case we have the parties, as they declared, contracted for their mutual benefit and in the interests of the neighborhood not to permit their land to be sold to, or used by, persons of the Negro race, and made this covenant binding upon their heirs and assigns. The form of the covenant is immaterial and it is not necessary it should run with the land. "A personal covenant or agreement will be held valid and binding in equity on a purchaser taking the estate with notice. It is not binding upon him merely because he stands as an assignee of the party who makes the agreement, but because he has taken the estate with notice of a valid agreement concerning it which he cannot equitably refuse to perform." Bryan v. Grosse, 155 Cal. 132, 99 P. 499, 501. And likewise in Codman v. Bradley,[8] it was said:

"It is plain from the language of the indenture that the parties intended a restriction upon each of the five lots in favor of the owners of lots 176 and 177, and their heirs and assigns, which should be for the benefit of the lots, whoever might be the owners of them. It is equally plain that equity will enforce such a restriction. It is not important to determine whether the instrument created a legal estate in the five lots, or precisely what legal estate is created, if any. It created a right enforceable in equity against all persons taking with notice of it, actual or constructive, and this equitable right is in the nature of an easement, even if it rests on no broader principle than that equity will enforce a proper contract concerning land, against all persons taking with notice of it. [Citing cases.] In the present case it plainly appears that the intention of the parties was that their respective promises should be for the benefit of the promisees as owners of the neighboring land, and of subsequent owners of these lots. Such a promise may always be enforced in equity by an owner."

As stated before, rights created by covenants such as these have been so consistently enforced by us as to become a rule of property and within the accepted public policy of the District of Columbia.

Little need now be said on the subject of that policy. The proposition is not new and was unsuccessfully urged in the Corrigan case, supra, in this court and in the

[5] Corrigan v. Buckley, supra; Torrey v. Wolfes, supra; Russell v. Wallace, supra; Hundley v. Gorewitz, supra; Queensborough Land Co. v. Cazeaux, 136 La. 724, 67 So. 641, L.R.A.1916B, 1201, Ann.Cas.1916D, 1248; Koehler v. Rowland, 275 Mo. 573, 575, 205 S.W. 217, 9 A.L.R. 107; Chandler v. Ziegler, 88 Colo. 1, 291 P. 822.

[6] Cowell v. Colorado Springs Co., 100 U.S. 55, 57, 25 L.Ed. 547.

[7] Tiffany, Real Property, 3d Ed., §§ 858, 862; Meade v. Dennistone, supra; cf.

Trustees of Columbia College v. Lynch, 70 N.Y. 440, 26 Am.Rep. 615, 38 N.Y.S..Ct.of App.Ed., 878, 880; Bryan v. Grosse, infra; Codman v. Bradley, 201 Mass. 361, 87 N.E. 591; Cotton v. Cresse, 80 N.J. Eq. 540, 85 A. 600, 49 L.R.A.,N.S., 357; Erichsen v. Tapert, 172 Mich. 457, 138 N.W. 330. See also Clark, Covenants and Interests Running with Land (1929), c. VI, The Running of Equitable Restrictions.

[8] 201 Mass. 361, 87 N.E. 591, 593.

Supreme Court. And nothing is suggested now that was not considered then. The Constitution is the same now as then, and we are cited to no new public laws, nor indeed to any other course or practice of Government officials, which the *private* action of the original owners of the block in question contravenes. And the public policy of a State of which courts take notice and to which they give effect must be deduced—in the main—from these sources. Surely it may not—properly—be found in our personal views on sociological problems. As to the District of Columbia, we must take judicial notice of the fact that separate schools are established for the white and colored races; separate churches are universal and are approved by both races; and that in the present local housing emergency, large amounts of public and, perhaps also, of private funds have been expended in the establishment of homes for the separate use of white and colored persons. And these accepted practices are not intended to and should not be considered to imply the inferiority of either race to the other.

That the broad social problem, of which the question in the instant case is but one aspect, is both serious and acute, no thoughtful person will deny. That its right solution in the general public interest calls for the best in statesmanship and the highest in patriotism is equally true. But it is just as true that up to the present no law or public policy has been contrived or declared whereby to eradicate social or racial distinctions in the private affairs of individuals. And it should now be apparent that if ever the two races are to meet upon mutually satisfactory ground, it cannot be through legal coercion or through the intimidation of factions, or the violence of partisans, but must be the result of a mutual appreciation of each other's problems, and a voluntary consent of individuals. And it is to this end that the wisest and best of each race should set their course.

Affirmed.

MILLER, Associate Justice (concurring).

The Supreme Court and this Court have established the law for the District of Columbia as it is set out in the majority opinion and we are bound to follow it. The considerations urged by Justice EDGERTON are persuasively presented. If proper weight was not given to them in the earlier decisions and if present-day conditions do not justify the position then taken, it has been within the power of Congress to change the law, during all the intervening years. If judicial reinterpretation of the law is now in order, it is the function of the Supreme Court, as the highest Court of the District of Columbia,[1] so to advise us.

EDGERTON, Associate Justice (dissenting).

I think the decision of the court is wrong for several reasons.

(1) I think this case is within the settled principle that when an agreement which restricts the use of real property can no longer serve its purpose it is not enforceable in equity. The parties to the agreement obviously wished to maintain the value of their properties and doubtless also wished to live in an exclusively white neighborhood. Enforcement today of this agreement made many years ago will accomplish neither purpose.

The agreement was made in 1925 by owners of all the houses and lots in the 2200 block of First Street N. W. Like the rest of First Street this block runs north and south. Most if not all of the property immediately west of this block, and for a considerable distance beyond, is occupied by Negroes. Six consecutive blocks on First Street, including the 2200 block and the blocks immediately north and south of it, were occupied by white persons and were subject to restrictive agreements at the time of the trial in the District Court. So was, and apparently still is, a considerable area immediately east of these six blocks. But the 2100 block on First Street,

---

[1] D. C. Code 1940, § 11—101: "The judicial power in the District shall be vested in—First. Inferior courts, namely, municipal court, juvenile court of the District of Columbia, and the police court; and Second. Superior courts, namely, the District Court of the United States for the District of Columbia, the United States Court of Appeals for the District of Columbia, *and the Supreme Court of the United States.* (Mar. 3, 1901, 31 Stat. 1190, ch. 854, § 2; Mar. 19, 1906, 34 Stat. 73, ch. 960; Feb. 17, 1909, 35 Stat. 623, ch. 134; June 7, 1934, 48 Stat. 926, ch. 426; June 25, 1936, 49 Stat. 1921, ch. 804.)" [Italics supplied].

which is immediately south of the 2200 block, ceased on November 1, 1944 to be covered by an agreement. When this suit was tried two houses in the 2100 block had already been sold to colored persons and suits regarding them were pending. The restrictive agreement with respect to the 2200 block itself will expire on September 1, 1946 and obviously will not be renewed. All of the property in the 2200 block is now more valuable for sale to Negroes than to white persons. There is ample testimony to that effect and there is no dispute about it. Real estate dealers testified that the houses in this block are worth about $7500 for sale to white purchasers and about $10,000 for sale to colored purchasers. Appellants' house had been vacant for some time, and a white person had offered $7500 for it, when appellant Mays bought it for $9,950. Performance of the restrictive agreement, instead of maintaining the value of property in the 2200 block, will actually depress it. The court should not enforce the agreement and defeat its most obvious purpose.

This is the more clearly true because enforcement of the agreement will not accomplish its other purpose. Since (1) the area immediately west of the 2200 block is largely occupied by colored people; (2) the block immediately south of the 2200 block is no longer restricted, and colored people have begun to buy homes there; (3) the 2200 block itself will cease to be restricted next year; (4) property in this block is more valuable to colored purchasers than to white purchasers; and (5) as a witness testified without dispute, the "trend" in the neighborhood is toward colored ownership and occupancy; it is evident that the neighborhood has lost the exclusively white character which the agreement sought to preserve, and that enforcement of the agreement during the short remainder of its life will not restore that character. As we said in Hundley v. Gorewitz, "The trend is unmistakable, its effect is apparent, and * * * to grant an injunction enforcing the covenant would merely depreciate all the property in the block without accomplishing the purpose which originally impelled its making, while to deny an injunction will leave all of the properties with a value commensurate to the conditions as they now exist. In these circumstances the equities require that we refuse injunctive relief and leave the parties to such remedies as they may have at law." [1]

(2) The effect of an injunction upon appellant Mays and her family must be considered. The family consists of appellant herself, a government employee; three sisters who are employed in Washington; and four nieces who attend school there. A house which they formerly rented was sold and they had to move. They had to break up their family, store their furniture, and rent rooms in various places until they bought the house in suit. According to appellant's undisputed testimony she "accepted this proposition because of an absolute lack of other available properties." To force her and her family to leave their home during the present acute housing emergency will subject them to very great hardship. It will probably compel them again to separate and rent such rooming space, if any, as they can find, and it may compel some of them to leave the District of Columbia and its vicinity. The chances are much against their being able, without months of search, to find a single house or apartment here that will accommodate them as a family.[1a] None of the cases on which the court relies, in which agreements against sales to Negroes were enforced, involved any circumstance even remotely resembling this. In accordance with the familiar principle of "balancing equities," the fact that an injunction will cause extreme hardship to the defendant without *commensurate* benefit to the plaintiff is in itself a sufficient reason for denying an injunction.

(3) The restriction in suit was created by a contract among the owners of some 32 houses and lots. None of the appellants was a party to that contract. None of them has ever agreed to be bound by it. Whether they should be required to conform to this contract which they never made involves more than the balancing of particular equities. It involves a question of general policy. The question is not whether the operators of a public or private housing development,[2] or other per-

---

[1] 77 U.S.App.D.C. 48, 50, 132 F.2d 23, 25.

[1a] Note 15 infra.

[2] "Much of the recent public housing is interracial in theory and increasingly so in fact, notably in Los Angeles, Pittsburgh, and Chicago." Edwin R. Embree, Race Relations Balance Sheet, p. 9; reprinted from Review for the Two-Year Period, 1942–1944, of the Julius Rosenwald Fund.

sons, may voluntarily select their tenants or their purchasers on the basis, among other things, of color. The question is whether a person who wishes to sell his house to a Negro and has contracted to do so, and has never contracted not to do so, should be prevented by a court from performing his contract because one of his predecessors in title once contracted with other property-owners that their property should not be sold to Negroes.

Since housing is a necessity of life, as an original question a contract of 32 property-owners that they and their successors will not sell houses to Negroes would seem to stand on much the same plane as a contract of 32 grocers that they and their successors will not sell food to Negroes.[3] The ultimate purpose of the combination was the advantage of its members, but its immediate purpose was to withhold a necessity from many persons by limiting the capacity of owners to transfer their property. As an original question, the contract in suit would seem to be an unreasonable restraint on alienation and plainly contrary to public policy. The Committee on Negro Housing of the President's Conference on Home Building and Home Ownership said in its Report in 1932: "Segregation * * * has kept the Negro-occupied sections of cities throughout the country fatally unwholesome places, a menace to the health, morals and general decency of cities, and 'plague spots for race exploitation, friction and riots.' "[4] It would seem clear, as an original question, that a court of equity would have nothing to do with such a contract unless to prevent its enforcement or performance.

(4) The decided cases do not clearly answer the question of policy on which, apart from the particular equities, this case turns. As long ago as 1917 the Supreme Court held in the Buchanan case that racial zoning of streets, by statute or ordinance, was unconstitutional.[5] The Court

held in 1926, in the Corrigan case, that an injunction to prevent a *party* to a contract like the one before us from conveying in breach of his contract did not violate the Constitution or the laws of the United States.[6] But the Court had no occasion to decide, and it expressly refrained from deciding, whether or not a contract of this sort was "void because contrary to public policy" or was "of such a discriminatory character that a court of equity will not lend its aid by enforcing the specific performance of the covenant." The Supreme Court has never decided whether this sort of contract is enforceable against anyone.

It would seem to be unsound policy for a court, in the exercise of its equitable discretion, to enforce a privately adopted segregation plan which would be unconstitutional if it were adopted by a legislature. Moreover the Supreme Court has recently said that "discriminations based on race alone are obviously irrelevant and invidious."[7] That case dealt with contracts between employers and a union which represented employees. The Court held that "Congress plainly did not undertake to authorize the bargaining representative to make such discriminations." For the current fiscal year Congress has authorized expenditure of $500,000 by the President's Committee on Fair Employment Practice.[8] Congress is the authoritative exponent of the public policy of the District of Columbia. I can see no sufficient distinction, from the point of view of policy, between discrimination in employment and discrimination in housing.

It is true that in 1924, in Corrigan v. Buckley,[9] this court restrained a *party* to a contract like the one before us from making a conveyance in violation of his contract. And this court has enforced covenants in deeds, of like tenor, against subsequent owners of the land who, as far as appears, were not parties to the deeds.[10] It does not follow that a mere contract

---

[3] At least if it be assumed that the motive of the grocers, as of the property-owners, is to exclude Negroes from their neighborhood.

[4] Negro Housing (1932) pp. 45, 46.

[5] Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149, L.R.A.1918C, 210, Ann.Cas.1918A, 1201.

[6] Corrigan v. Buckley, 271 U.S. 323, 332, 46 S.Ct. 521, 524, 70 L.Ed. 969.

[7] Steele v. Louisville & Nashville Railroad Co. et al., 65 S.Ct. 226. In a concurring opinion Mr. Justice Murphy

said: "The Constitution voices its disapproval whenever economic discrimination is applied under authority of law against any race, creed or color."

[8] This Committee was created by the President in 1941 and reconstituted in 1943. Exec. Order No. 9346, May 27, 1943.

[9] 55 App.D.C. 30, 299 F. 899, appeal dismissed 271 U.S. 323, 46 S.Ct. 521, 70 L.Ed. 969.

[10] e. g., Torrey v. Wolfes, 56 App.D. C. 4, 6 F.2d 702.

like the one before us, against selling land to Negroes, is enforceable against a subsequent owner of the land who has notice of the contract but is not a party to it.[11] Whether it is so enforceable is a question which this court has never had occasion to decide until now.

There is a substantial difference between the policy of enforcing against subsequent owners a restraint on alienation created by a deed and the policy of enforcing against them a restraint on alienation created only by a contract, though either policy, in my opinion, is thoroughly bad. If the restraint can be created only by a deed, that fact provides a substantial limitation on its spread; but if neighboring landowners, by merely making and recording a contract, may impose a restraint on alienation which is enforceable against subsequent landowners, unlimited quantities of land may rapidly be subjected to the restraint. By holding that such a restraint may be imposed in such a way this court is not simply following precedent. It is adding an unfortunate extension to an unfortunate doctrine.

(5) Quite aside from the fact that our Corrigan decision was probably unsound when it was rendered,[12] and the fact that it would not cover this case even if general conditions in the District of Columbia had remained the same, I think it is quite inapplicable today because general conditions have not remained the same. It was a decision on a question of policy. Questions of policy have no meaning in a vacuum but relate to particular situations. *The housing situation in the District of Columbia has changed since 1924.* Although the first World War created a temporary housing emergency, by 1924 the Supreme Court was prepared to take judicial notice of the fact that the emergency had ceased.[13] It is a matter of common knowledge that the emergency is now acute [14] and that the shortage of decent housing, or any housing, for Negroes is particularly acute.[15] We cannot close our eyes to what is commonly known. The conditions in

[11] Traditionally a covenant does not "run with the land" so as to be enforceable at law against subsequent purchasers unless there is some "privity" between the parties to the covenant, as in the case of grantor and grantee or lessor and lessee. Tiffany, Real Property, 3d Ed., § 851. It is true that, despite the absence of "privity," contracts between neighboring landowners which regulate *only* the *use* of land and make no attempt to impose restraints on its alienation have been enforced in equity against subsequent purchasers with notice. Thus in Castleman v. Avignone, 56 App.D.C. 253, 12 F.2d 326, a contract with respect to a building-line was enforced against a purchaser. Cf. Tiffany, Real Property, 3d ed., § 858. But no case has been called to our attention in which any court, on any theory, has enforced against anyone but a contracting party a contract like the one in suit, which attempts to create a restraint on alienation and is not embodied in a deed or lease. In Meade v. Dennistone, 173 Md. 295, 196 A. 330, 114 A.L.R. 1227, the contract which was enforced against purchasers forbade *use* of land by Negroes but did not forbid *transfer* to Negroes. The contract before us forbids both use and transfer. In my opinion neither prohibition should be enforced.

[12] When Mr. Justice Rutledge was a member of this court he expressly reserved his opinion on the question whether covenants against selling land to Negroes were valid. Hundley v. Gorewitz, 77 U.S.App.D.C. 48, 50, 132 F.2d 23.

[13] Chastleton Corp. v. Sinclair, 1924, 264 U.S. 543, 548, 549, 44 S.Ct. 405, 68 L.Ed. 841.

[14] The Rent Control Act of the District of Columbia provides: "It is hereby found that the national emergency and the national-defense program (1) have aggravated the congested situation with regard to housing accommodations existing at the seat of government; * * * (3) have rendered or will render ineffective the normal operations of a free market in housing accommodations; and (4) are making it increasingly difficult for persons whose duties or obligations require them to live or work in the District of Columbia to obtain such accommodations. * * *" 55 Stat. 788, D.C.Code 1940, Supp. III, § 45—1601; December 2, 1941.

[15] "The already overcrowded Negro quarters had to squeeze in the newcomers. The results here must be seen to be believed. Not only houses have been subdivided, but small rooms * * * have been partitioned with cardboard to absorb more tenants * * * What can, for instance, our very competent Health Department do about it? The only thing it can do is put the tenants on the street because there is not, and has not been for six months, a single available Negro dwelling in Washington, except a few for in-migrant war workers. * * * The crowding in the slums of the District

which many of the 187,000 Negroes in the District of Columbia have long been obliged to live are now worse than ever. Since restrictive contracts and covenants are among the factors which limit the supply of housing for Negroes and thereby increase its price, it cannot be sound policy to enforce them today, whatever may have been true in 1924.

In order to work people must live within reach of their work, and in order to work effectively they must live in some degree of comfort. Requiring Negroes to live according to their common color instead of their individual capacities hampers the war effort by interfering with their employment. Congress has declared in the Rent Control Act of the District that it is "the policy of the Congress during the existing emergency to prevent * * * practices relating to housing accommodations in the District of Columbia which may tend to

has also been intensified by the fact that not only housing but the areas formerly occupied by Negroes have decreased." Agnes E. Meyer, Negro Housing: Capital Sets Record for United States in Unalleviated Wretchedness of Slums. Washington Post, Feb. 6, 1944, Sec. II, p. 1.

"The present war housing program * * * seems to provide adequately for white, in-migrant war workers. In fact there may be a surplus of immediately needed dwellings for white in-migrant war workers. It does not provide, however, for residents of the District of Columbia who are not in-migrant war workers. For Negroes * * * it does not provide adequately even in terms of in-migrant war workers. So there should be an increase in the allocation of dwellings for Negroes. * * * The need is urgent and that need will continue." Annual Report of the National Capital Housing Authority for the fiscal year ended June 30, 1943, p. 7.

The following quotations are from Investigation of the Program of the National Capital Housing Authority: Hearings before a Subcommittee of the Committee on the District of Columbia, United States Senate, 78th Congress, 2d Session, on S. Res. 184 and S. 1699 (1944):

"Housing conditions among Negroes, as it relates to the war effort, is a critical social and economic problem in Washington * * *." Part 2, p. 208. From Resolution of the War Housing Center Advisory Committee, December 1943.

"I have a negro maid who has five little children. Her husband makes $30 a week and she does day work, at about $4 or $4.25 a day. She lives in one room with those five children. * * * I have called every place in this city and I cannot get a place for her to live." Part 3, p. 447. Statement of Mrs. Leslie B. Wright, Executive Secretary, Northwest Citizens' Council, Washington, D. C., and Member of the Legislative Committee of the Federation of Women's Clubs; March 10, 1944.

" * * * From the information gained by the U Street Council about 2 months ago, it was shown that there were no apartments and houses available for Negro residents." Part 3, p. 775. Statement of Marjorie Baltimore, U Street Neighborhood Council, Washington, D. C.; April 5, 1944.

" * * * I am a member of the advisory committee on the War Housing Center here * * *. There are one-bedroom apartments to be found. There are practically no dwelling units available for larger families * * * speaking of white families, and none whatever where there is one bedroom, or more, for Negro families." Part 3, p. 782. Statement of Arthur Stein, President, United Federal Workers of America; April 6, 1944.

"It is generally recognized that there are practically no vacancies today for the Negro citizen of any income level in Washington. Hundreds of Negro war workers and resident families, evicted through no fault of their own, are separated and doubled up in already overcrowded dwellings * * *. The widespread use of restrictive covenants in the District constitutes a distinctive feature which distinguishes the housing problem of Negroes from that of all other racial groups. Confined by these intangible but almost impregnable barriers, Negroes * * * are discriminated against in the housing market by being thus barred from bidding in the open market for homes." Part 4, pp. 1110–1111. Statement of Mrs. Robert G. McGuire, Chairman, Emergency Committee on Housing in Metropolitan Washington; May 19, 1944.

"(1) The Negro population of the area has rapidly increased;

"(2) Various developments, such as roads, public buildings, housing projects, etc., have reduced the areas heretofore open to Negro occupancy;

"(3) There is evidence of actual reduction in the number of dwelling units available to Negroes." Part 4, p. 1129. Interim Report of the Study Subcommittee of the Emergency Committee on Housing in Metropolitan Washington; May 19, 1944.

"The main reason why Negroes have

increase the cost of living or otherwise impede the national-defense program." [16] "Race restriction agreements, undertaking to do what the state cannot, must yield to the public interest in the sound development of the whole community." [17]

(6) The majority opinion does not and consequently, on analysis, the concurring opinion does not contend that the Supreme Court has determined either the question of particular equities or the question of general policy on which this case turns. If, as the majority say, decisions of our court have determined those questions adversely to appellants, we should overrule the decisions. We cannot turn the Supreme Court's power of review into a duty or our duty of reinterpreting the law into a privilege.

---

not moved from these congested areas into more adequate neighborhoods is the widespread use of covenants, agreements, and neighborhood resistance to the occupancy by Negroes of undeveloped and developed areas. The effect of these restrictions has been to limit artificially the housing market for Negroes and cause them to pay higher prices for the same or less value and services. This feature makes the housing problem of Negroes distinctive from that of any other racial group." Part 4, p. 1137. Statement of Mrs. Pauline R. Coggs, Executive Secretary of The Urban League and Chairman of the Research Committee of the Emergency Committee on Housing in Metropolitan Washington; May 19, 1944.

"Since 1940 * * * there has been intensive overcrowding even among the comparatively well-to-do * * *. Even in 1934 * * * there was a shortage of low-rental and moderate rental dwellings. This situation was especially acute among the Negroes * * *. Recently the assistance given by the Federal Housing Administration has somewhat relieved the situation in the higher-rental brackets. But the completion of only 97 houses in lower-rental brackets * * * is not very encouraging." Part 5, p. 1404. Concluding statement and summary by John Ihlder, Executive Officer, National Capital Housing Authority; Oct. 5, 1944.

In the entire Hearings, I have found no statements which substantially controvert those which I have quoted. There are many others to similar effect.

[16] 55 Stat. 788, D.C.Code, 1940, Supp. III, § 45—1601, Dec. 2, 1941.

[17] Traynor, J., concurring, in Fairchild v. Raines, Cal.Sup.1944, 151 P.2d 260, 269.