## MECKLER et al. v. BAUGH.
### No. 502.

Municipal Court of Appeals for the District of Columbia.

June 12, 1947.

Herman Miller, of Washington, D. C., for appellants.

Philip W. Thomas, of Washington, D.C. (Thomas W. Parks, of Washington, D. C., on the brief), for appellee.

Before CAYTON, Chief Judge, and HOOD and CLAGETT, Associate Judges.

CAYTON, Chief Judge.

This is an appeal by defendants from a judgment awarding plaintiff the refund of a $500 deposit on the purchase of real estate.

In August 1946, Warren F. Baugh, a per-

son of Negro blood, signed a contract for the purchase of residential property at 1426 C Street, Northeast. The owner of the property was Mark Meckler, and his agent in the transaction was R. G. Dunne. A day or two after the contract was signed the agent presented Baugh with a new contract on which was typed this recital: "Buyer has full knowledge of covenant on record which is attached hereto and made part of this contract which has been signed by the purchaser." Attached to the contract was an exact copy of a covenant, dated in March 1945 and recorded the following month, by which eighteen owners of property on both the north and south sides of C Street, Northeast, in the block where the house in question was located, agreed that for a period of five years none of that property would "be used or occupied by, or sold, conveyed, leased, rented or given to Negroes or any person or persons of the Negro race or blood." [1]

Plaintiff testified that the agent told him he had brought the new contract form for his signature because the first contract had not mentioned the covenant and the seller wanted him to know about it; that the agent told him the covenant would not be enforced because some of the houses on the block, including the house next door, were already occupied by colored people and that the other owners were also going to sell their homes to Negroes. Plaintiff admitted that he knew the meaning of the covenant before he signed the contract. He also admitted that he initialed the clause reciting that he had full knowledge of the covenant. He also admitted signing a separate agreement, by which he would have been permitted to move into the house upon putting up $3,500 of the purchase price in escrow, and in which he certified "that I have full knowledge of the existing covenant now in effect covering said 1426 C Street, N. E., and assume full liability in moving in said premises." He further testified that though no one had even inferred that any action would be taken to enforce the covenant, he had later decided that he did not want a house carrying a restrictive race covenant.

He consulted a lawyer who in his behalf notified Meckler, the owner, and Dunne, the agent, that he rescinded the contract and demanded the return of his deposit. Owner and agent rejected the demand and declared the deposit forfeited.

The testimony for defendants concerning the negotiations was practically identical with that of plaintiff. It plainly established that there were on the two sides of the street about twenty-six houses of which at least eighteen were already occupied by colored people; and that all the other owners had listed their property for sale to Negroes. Defendant Dunne also testified that the neighborhood had been in this condition for some time and that he had never heard of anyone attempting to enforce the covenant.

■ It was upon this evidence that the trial judge made a general finding for plaintiff against the two defendants, the owner and the agent, who are now before this court as appellants. In the evidence, as we have seen, there was no factual dispute on the decisive phases of the case; thus the decision necessarily turned on legal questions. Since the trial judge gave no reasons for his decision we shall examine it and test it by the basic legal principles which govern.

■ We must start out with the proposition that restrictive race covenants of this kind are valid and not against public policy in this jurisdiction. This has been repeatedly declared by the United States Court of Appeals for the District of Columbia. Corrigan v. Buckley, 55 App.D.C. 30, 299 F. 899, appeal dismissed 271 U.S. 323, 46 S.Ct. 521, 70 L.Ed. 969; Torrey v. Wolfes, 56 App.D.C. 4, 6 F.2d 702; Russell v. Wallace, 58 App.D.C. 357, 30 F.2d 981, certiorari denied 279 U.S. 871, 49 S.Ct. 512, 73 L.Ed. 1007; Cornish v. O'Donoghue, 58 App.D.C. 359, 30 F.2d 983, certiorari denied 279 U.S. 871, 49 S.Ct. 512, 73 L.Ed. 1007; Grady v. Garland, 67 App.D.C. 73, 89 F.2d 817, certiorari denied 302 U.S. 694, 58 S.Ct. 13, 82 L.Ed. 536; Hundley v. Gorewitz, 77 U.S. App.D.C. 48, 132 F.2d 23; Mays v. Burgess, 79 U.S.App.D.C. 343, 147 F.2d 869, 162 A.

---

[1] It will be noted that unlike the covenants in some of the cases cited later in this opinion, this one contained no penalty clause.

L.R. 168; certiorari denied 325 U.S. 868, 65 S.Ct. 1406, 89 L.Ed. 1987, rehearing denied 325 U.S. 896, 65 S.Ct. 1567, 89 L.Ed. 2006; Gospel Spreading Ass'n Inc., v. Bennetts, 79 U.S.App.D.C. 352, 147 F.2d 878. Just a few days ago, while this appeal was pending before us, the United States Court of Appeals again took the same position. Hurd v. Hodge, App.D.C., 162 F.2d 233.

■ Appellee (plaintiff below) acknowledges this. Indeed he fashions from it what we understand to be his principal argument for his right to rescind. He says that race covenants having been so consistently upheld, the contract between these parties to violate the covenant was illegal and void because its purpose was against public policy. This argument we must reject. To hold that race covenants are not contrary to public policy is totally different from saying that it is against public policy for the parties to such a covenant or their successors in interest to abandon it by non-enforcement, or to waive it altogether.[2] Racial covenants, the United States Court of Appeals has said,[3] are like covenants otherwise restricting the use of real property, such as covenants against business uses. Such covenants like other contracts are deemed not contrary to public policy: they are enforceable by proper parties in interest; but no public policy declares that they may not be waived or abandoned. To decide otherwise would perpetuate covenants when the conditions under which they were made have changed or disappeared. In such cases "to enforce the restriction would be to create an unnatural barrier to civic development and thereby to establish a virtually uninhabitable section of the city."[4]

The rule was laid down in the Hundley case and in the Gospel Spreading Ass'n case that when the character of a neighborhood has changed so greatly that enforcement of the covenant would no longer serve its original purpose, the law regards the covenant as having become ineffective. Here, according to the uncontradicted evidence the increase of colored ownership and residence in the block has been so marked (eighteen out of twenty-six houses being occupied by colored and the remaining eight being listed for sale to colored people)[5] that the rule in the two cases just cited would inevitably apply.

■ Here, moreover, the character of the neighborhood changed, not by a slow or gradual process extending over a period of years, nor with mere inaction or acquiescence by the owners. On the contrary, the owners themselves brought the change about by their deliberate, affirmative and seemingly concerted action in opening up the block to colored occupancy. The effect of their action is unmistakable. It amounts to a complete waiver of the covenant.[6] All the parties to the covenant have combined to kill it; and kill it they have, just as effectively as they could have done by any written and recorded instrument. And yet, dead as the covenant is, we are asked to breathe new life into it, by saying that the parties had no right to waive it. This we decline to do, for it would obviously be against the public interest, and destructive of freedom of contract as well.

It cannot be said that Mr. Baugh was "buying a law suit," for there is no one left who might conceivably attack his title or his right of possession. And even if such an attempt were made, neither the plaintiff, the trial court, nor this court would have any reason to expect that the "change of neighborhood" rule would not be honored in the courts, especially in view of the waiver we have discussed. We assume that the segregation policy having been repudiated by all the owners, a segregation covenant could not be enforced.

■ But tested by an even simpler principle of law, we think plaintiff had no right to recover, under the general circumstances

[2] For a discussion of the general question of waiver of covenants, see Osius v. Barton, 109 Fla. 556, 147 So. 862, 88 A.L.R. 394; Stephl v. Moore, 94 Fla. 313, 114 So. 455, and cases there cited.

[3] Hundley v. Gorewitz, supra.

[4] Hundley v. Gorewitz, supra [132 F.2d 24].

[5] It should also be remembered that the covenant, by its own terms, now has less than three years to run.

[6] Compare Jameson v. Brown, 71 App. D.C. 254, 109 F.2d 830. See also Osius v. Barton and Stephl v. Moore, supra.

we have recited. Despite the covenant, which he fully understood, he signed the sales contract, initialed thereon his "full knowledge" of the covenant, signed the covenant itself and in a separate writing assumed "full liability" under the covenant in connection with his proposed occupancy of the house. And he has not made even a suggestion of fraud or misrepresentation on the part of the owner or the owner's agent. Thus, even upon his own testimony it is plain that he was a purchaser who with full knowledge of every detail of the situation entered into a valid and binding contract of purchase; and later, for no valid reason, attempted to disavow his contract. Such a purchaser, as we have held in two recent cases,[7] is not entitled to demand the return of his deposit money.

Reversed.

---

[7] Mitchell v. Ralph D. Cohn, Inc., D.C.Mun.App., 52 A.2d 631; Sabghir v. Ginsburg, D.C.Mun.App., 51 A.2d 308.