*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CV-1163

DTLD, LLC, *et al.*, APPELLANTS,

V.

POWER STATION LIMITED PARTNERSHIP, *et al.*, APPELLEES.

&

No. 24-CV-1173

JPMORGAN CHASE BANK, N.A., APPELLANT,

V.

DTLD, LLC, *et al.*, APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(2023-CAB-006784)

(Hon. Carl E. Ross, Motions Judge)

(Argued December 2, 2025     Decided February 12, 2026)

*James T. Bacon* for appellants DTLD, LLC, and Iraklion, LLC.

*Eric S. Lammers*, with whom *Corey Zoldan* was on the brief, for appellees Power Station Limited Partnership, Southern Building Associates, LLP, 15th and H Street Associates, LLP, and SJG Properties, LLC.

*Jessica L. Farmer*, with whom *Zachary Lundgren* was on the brief, for appellant JPMorgan Chase Bank, N.A.

Before EASTERLY and SHANKER, *Associate Judges*, and THOMPSON, *Senior Judge*.

THOMPSON, *Senior Judge*: The underlying issue in these consolidated appeals is the enforceability of a restrictive covenant that limits the use of an alleyway parcel of real property (the Property) formerly owned by appellee Power Station Limited Partnership (Power Station) and now owned by appellant DTLD, LLC (DTLD). When Power Station sold the Property in 2008, it included in the (recorded) deed a perpetual restrictive covenant that prohibited the Property from being used as a nightclub. Nearly fifteen years later, in 2023, appellant DTLD purchased the Property at an auction and subsequently leased it to appellant Iraklion, LLC (Iraklion), which has obtained a provisional alcoholic beverage license to operate a nightclub at the Property. In November 2023, Power Station and neighboring property owners filed a complaint for injunctive and declaratory relief to enforce the covenant and, after discovery, filed a motion for summary judgment. This appeal followed after the trial court entered summary judgment in favor of the plaintiffs and denied defendants' cross-motion. Separately, JPMorgan Chase Bank, NA (JPMorgan), filed a motion to intervene in the litigation, which the trial court denied as moot. JPMorgan has appealed the denial of its intervention motion. For the foregoing reasons, we affirm the grant of summary judgment and the order dismissing the intervention motion as moot.

**I.**

The Property is located in a mixed-use zone within the District of Columbia's Central Business District, where there is a mixture of office, retail, residential, entertainment, and other establishments, including other nightclubs. The Property address is 1412 I Street, N.W., but the Property is "located entirely within a network of public alleyways and has no frontage on any public street." Vehicular access to the property is limited to a twenty-foot-wide alley running between 14th and 15th Streets, a ten-foot-wide alley running perpendicular to the previous alley, and a private driveway owned by JPMorgan that directly abuts the Property to the west. Patrons of the Property must enter and exit through the alleyways.

Most recently, the Property has been used as an office building. However, prior to 2008, a nightclub known as the Zei Club operated at the Property. During the period of its operation, there were fights and other violence in the alley outside the nightclub, including a 1998 near-fatal beating of a patron who had exited the Zei Club, which culminated in litigation that was resolved in 2009.[1]

---

[1] *See generally Novak v. Capital Mgmt. & Dev. Corp.*, 570 F.3d 305 (D.C. Cir. 2009); *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 904 (D.C. Cir. 2006).

After the Zei Club closed, Power Station, which owned the Property at the time, was particularly concerned about the continued operation of a nightclub at the secluded, narrow-alleyway location, given the risks of loitering, violence, and crime and the challenges the location and patron lines present for access by emergency, delivery, and service vehicles. Power Station asserts that it rejected potential lessees that wanted to open another nightclub in the Property, believing that such a use would disrupt neighboring properties and cause the value of other surrounding properties it owns to decrease in value. Power Station ultimately agreed to sell the Property when the buyer agreed to a restriction that would preclude such a use. On or about January 15, 2008, Power Station transferred ownership of the Property by a Special Warranty Deed (the "2008 Deed") containing a restrictive covenant that by its terms was "expressly made for the benefit of [g]rantor, and any successor in interest to the owners of real properties located in Square 220," was expressly made "binding upon the [g]rantee and any successor in interest thereto," and states in relevant part: "In no event shall there be conducted at the Property any nightclub or discotheque nor any other establishment which distributes or sells alcoholic beverages after midnight."

The Property was sold again in 2015 to a subsequent buyer, which used it as an office space. In 2023, appellant DTLD, the current owner, purchased the Property at an auction. Bidders at the auction were informed about the restrictive covenant,

and DTLD admits it knew about it. After purchasing the Property, DTLD entered into an agreement with co-appellant Iraklion to operate a nightclub on the Property, and on July 28, 2023, the two entities submitted an application to the Alcoholic Beverage and Cannabis Board (the ABC Board or the Board) to transfer to the Property a Retailer's Class CN license, which permits nude dancing. According to appellants, the proposed nightclub "is likely to feature" nude dancing and "Vegas-style" shows and would have a total occupancy of 1,200, seating for 675 patrons, and the following hours of operation: 8:00 AM to 3:00 AM on Sunday through Thursday; and 8:00 AM to 4:00 AM on Friday and Saturday.

The CN-license transfer application was the subject of much controversy. The ABC Board's inquiry with respect to the license-transfer application was whether the transfer would have "an adverse impact on the peace, order, and quiet; residential parking and vehicular and pedestrian safety; and real property values of the area located within 1,200 feet of the establishment." During a protest hearing that spanned two days, opponents of the license transfer expressed fears about the disruptive nature of a nightclub, the undesirable noise levels, the potential for conflicts between vehicles and pedestrians, the risk of crime or violence, and other adverse effects on property value and the general neighborhood. JPMorgan, which owns property in Square 220, participated in the hearing, explaining that the nightclub could adversely disrupt its own (next-door to 1412 I Street) operations

given its proximity to the Property and the possibility of nightclub patrons using JPMorgan's private driveway. The ABC Board declined to consider evidence or arguments relating to the restrictive covenant, noting "whether or not there is or is not a covenant, that is not our issue to rule on at this juncture, so it is not relevant to the ABC Board to elicit testimony on that specific issue." On June 5, 2024, the Board approved the transfer of a CN license to the Property, "credit[ing] Iraklion's plans to promote public safety" and "to discourage violent incidents in and around the establishment" and finding that a nightclub is "eminently appropriate" for the location.[2]

Meanwhile, on November 2, 2023, while the ABC license-transfer application was pending (and prior to the protest hearing), Power Station and neighboring property owners had filed their suit in the Superior Court, seeking to enjoin DTLD and Iraklion from opening a nightclub on the Property based on the restrictive covenant. DTLD and Iraklion counterclaimed to invalidate the restrictive covenant. On August 12, 2024, the parties filed cross-motions for summary judgment. On September 23, 2024, nearly eleven months after Power Station and neighboring property owners filed their initial complaint, after the close of discovery, and over a

---

[2] The ABC Board considered the application under D.C. Code §§ 25-104 and 25-313(b) and 23 D.C.M.R. §§ 1607.2 and 1607.7(b).

month after the motions for summary judgment were filed, JPMorgan moved to intervene in the lawsuit.

On November 22, 2024, the Superior Court granted Power Station's motion for summary judgment, denied DTLD's motion for summary judgment, dismissed DTLD's counterclaim with prejudice, and denied as moot JPMorgan's motion to intervene. In concluding that the restrictive covenant is valid and enforceable, the Superior Court reasoned that its language is unambiguous; that appellants had both actual and constructive notice of the restriction; that the covenant leaves defendants with free use of the Property except for the nightclub restriction; that there has been no radical change in the neighborhood of the Property that defeats the purpose of the covenant; that the alleyway location that necessitated the covenant is unchanged; that appellants' proposed security measures could be scaled back at will; and that enforcement of the covenant would not preclude a possibility in the future that the covenant could become unenforceable upon a change in conditions.

In challenging the Superior Court's grant of summary judgment in favor of appellees, appellants argue that the restrictive covenant is unreasonable and unenforceable because it is perpetual in duration; because, assertedly, it can be justified only "by reference to economic and other conditions that no longer pertain to the location of the covenanted property or the District as a whole"; and because,

appellants contend, it is unnecessary for public safety. Appellants cite in particular what they contend is a "substantial improvement in crime rates" and "substantially increased foot traffic" in the downtown area where the Property is located since the restrictive covenant was imposed; a "challenging" commercial real estate market (including a high number of commercial office vacancies) following the COVID pandemic and a resultant "devastating" decline in tax revenue to the District; their own "robust plans to control neighborhood impacts" and to minimize traffic, fire safety, and noise issues; and the creation of jobs and resultant increase in District tax revenues that they claim the proposed nightclub would occasion. At the very least, appellants argue, a fact-sensitive inquiry into those matters was warranted, such that summary judgment for appellees was inappropriate.

## II.

This court reviews de novo the grant of a motion for summary judgment, applying the same standard the trial court was required to apply. *U.S. Bank Tr., N.A. v. Omid Land Grp., LLC.*, 279 A.3d 374, 377 (D.C. 2022). Like the trial court, we may consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *Wallace v. Eckert, Seamans, Cherin & Mellott, LLC*, 57 A.3d 943, 949 (D.C. 2012) (citation modified). We will affirm a grant of summary judgment only if "the record shows there is no genuine issue of

material fact and the movant is entitled to judgment as a matter of law." *Welsh v. McNeil*, 162 A.3d 135, 143 (D.C. 2017).

## III.

## A.

We begin our analysis by addressing appellants' somewhat overstated assertion that "courts in the District have long disfavored . . . restrictions on the free use of property." This court has observed that "covenants running with the land generally are valid and enforceable." *Capitol Hill Restoration Soc'y v. Zoning Comm'n*, 380 A.2d 174, 184 (D.C. 1977), *overruled in part on other grounds*, 392 A.2d 1027, 1036 (D.C. 1978)). We have also recognized that restrictive covenants can give rise to legitimate expectations about the use of a property by owners of neighboring properties. *See Watergate E. Comm. Against Hotel Conversion to Co-Op Apartments v. D.C. Zoning Comm'n*, 953 A.2d 1036, 1048 (D.C. 2008). And while we have endorsed "the well-recognized *rule of construction* that restrictions on land use should be construed in favor of the free use of land and against the party seeking enforcement," *Found. for the Pres. of Historic Georgetown v. Arnold*, 651 A.2d 794, 797 (D.C. 1994) (emphasis added), "if [a] deed's language is plain and unambiguous, there is no room for construction." *Wilkinson v. Bd. of Cnty. Comm'rs of St. Mary's Cnty.*, 279 A.3d 1052, 1068 (Md. Ct. Spec. App. 2022); *cf. FOP/Dep't*

*of Corr. Labor Comm. v. D.C. Pub. Emp. Rels. Bd.*, 973 A.2d 174, 178 (D.C. 2009) ("No interpretation . . . [was] necessary to discern that, by its terms and 'on its face,' the [statute] requires an offset of interim earnings."). Our case law[3] has been clear that if a deed is unambiguous, "the court's role is limited to applying the meaning of the words," *DLY-Adams Place, LLC v. Waste Mgmt. of Md., Inc.*, 2 A.3d 163, 166 (D.C. 2010) (quoting *Arnold*, 651 A.2d at 796), unless a restrictive covenant set out therein is unreasonable or is against public policy. *See Castleman v. Avignone*, 12 F.2d 326, 329 (D.C. Cir. 1926) ("Restrictions upon the free use and enjoyment of real estate are not favored by the law. But when restrictions are made, which are reasonable and not against public policy, they will ordinarily be enforced. . . . And this is the rule, although the restrictions may be permanent."); *see also McNeil v. Gary*, 40 App. D.C. 397, 400, 402 (D.C. Cir. 1913) (reasoning that unless the meaning "gleaned from the language of the instrument" governs, covenants "become a mere jumble of words, and their obvious intent is frustrated").

In the instant case, the Superior Court found, and none of the parties disputes, that the restrictive covenant's plain language "unambiguously" prohibits the type of establishment appellants plan to operate on the property. We agree with that

---

[3] *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) ("[D]ecisions of the United States Court of Appeals rendered prior to February 1, 1971, . . . constitute the case law of the District of Columbia.").

assessment. We also agree with appellees that the restrictive covenant here is not violative of any identified public policy. Our focus therefore is on whether, as appellants argue, the restrictive covenant at issue here is unreasonable and whether, as appellants contend, its enforcement would "implicate weighty issues of equity."

Our binding precedent establishes that "[e]quity will not, as a rule, enforce a restriction, where . . . the property, and that in the vicinage, has so changed in its character and environment and in the uses to which it may be put as to make it unfit or unprofitable for use if the restriction be enforced, or where [enforcement] would be a great hardship on the owner and of no benefit to the complainant[.]" *Jameson v. Brown*, 109 F.2d 830, 831 (D.C. Cir. 1939). *Jameson* involved the enforcement of a covenant against the sale of liquor in the Columbia Heights neighborhood, an area that was "largely open country" when the covenant was incorporated in deeds in 1899 but, by 1939, had become partly or largely commercial. *Id.* The *Jameson* court noted that there was "no contention that existing conditions make any land in the tract unfit or unprofitable for use if the restriction is enforced." *Id.* The court credited an expert's testimony that "no higher rents c[ould] be obtained from liquor stores than from other stores" and observed that the effect of the restrictive covenant on land value was irrelevant in any event. *Id.* at 832. The court also noted that owners of neighboring properties had entered into land transactions in reliance on the restrictive covenant and observed that the parties seeking to sell liquor were

aware of the covenant and had anticipated efforts to enforce it before incurring expenses to set up business at the location. *Id.* Given those facts, the *Jameson* court concluded that "the trial court was clearly right in holding the covenant enforceable." *Id.* at 832.[4]

In *Castleman*, the court considered whether to enforce a covenant that restricted the erection on specified lots of any building whose front line would be closer than 7 ½ feet to the front line of the lot. 12 F.2d at 327. The court explained that the restrictive agreement would be binding "unless the . . . reasons urged by appellants lead us, equitably, to a different conclusion." *Id.* at 330. In determining whether enforcement of the building-line restriction would be inequitable, the court considered a claim that "the character and condition of the lands" had changed in that businesses had "encroached to some extent" upon the once-exclusively-residential area. *Id.* at 331. The court reasoned that a "change in the use of the buildings on the street since the execution of the indenture d[id] not affect the . . . right" to enforce the restriction because "[t]he importance of the maintenance of a

---

[4] *See also, e.g.*, *Kenealy v. Chevy Chase Land Co.*, 72 F.2d 378, 380 (D.C. Cir. 1934) (reasoning that equity would not remove a restriction "at the expense of all of those who bought their homes in reliance upon the general plan or scheme" that the restriction facilitated).

building line may be as great when buildings are used for purposes of business as when they are occupied only as dwellings." *Id.* (internal quotation marks omitted).

*Jameson*, *Castleman*, and other longstanding precedents in our jurisdiction[5] applied variants of the so-called "radical change doctrine," which the Superior Court found has been adopted by forty-three jurisdictions.[6] Exercising our de novo review and applying only the factors identified in those precedents to the undisputed facts here, we could readily conclude that the Superior Court did not err in granting summary judgment to appellees and enforcing the restrictive covenant. The restrictive covenant's preclusion of use of the Property as a nightclub is

---

[5] *See, e.g.*, *Meckler v. Baugh*, 53 A.2d 695, 697 (D.C. 1947) ("[W]hen the character of a neighborhood has changed so greatly that enforcement of the covenant would no longer serve its original purpose, the law regards the covenant as having become ineffective.") (a case that we cite only for this narrow point but reject for its statements treating restrictive race covenants as "valid").

[6] That doctrine, which establishes an equitable test for determining whether to invalidate a restrictive covenant, has been summarized in secondary authority as follows: "Restrictive covenants may be rendered invalid or unenforceable where there has been such a radical change in the character of the neighborhood within and surrounding the restricted area that the original purpose of the covenant has been defeated, it is no longer of substantial value to the benefited land, and its enforcement would be unduly oppressive to the burdened land." 76 A.L.R.5th 337 (2000); *see also* 3 Tiffany Real Prop. § 875 (3d ed.) (explaining that the majority rule is that a change in the character and environment of the neighborhood typically will not provide a defense against enforcement of a restrictive covenant "if the restriction continues to be of value to the property sought to be benefited or if the change in the character of the neighborhood is not so radical and permanent as to make the restriction plainly unjust").

unambiguous; appellants were on notice of the restriction when they purchased the Property and when they pursued a license that would permit the proposed nightclub to operate there; there has been no change in the secluded-alleyway setting of the Property that fostered the public-safety and vehicle-access issues that led Power Station, as the transferor of the Property and the owner of surrounding properties, to include the restrictive covenant in the deed of conveyance (and thus it cannot be said that the covenant no longer serves its original purpose or has outlived its usefulness); no evidence was presented that any changes in the surrounding neighborhood have otherwise diminished the value or utility of the restriction; the covenant restricts only one use of the Property; and there is no claim that other uses of the Property would not be profitable or that the Property is unfit for other uses.[7]

We cannot say, however, that the foregoing cases identify exhaustively the factors that may make it appropriate for equity to refuse enforcement of a restrictive covenant on the ground that enforcement would be "[un]reasonable [or] against public policy." *Castleman*, 12 F.2d at 329. Such concerns obviously could extend

---

[7] Appellants urge us not to employ an analysis in which "all that matters is that the covenantor had an articulable rational purpose at the time the covenant was imposed, and subsequent events or changes in the surrounding area play little or no role in the analysis." We do not think that criticism fairly describes the tests articulated in the foregoing case law and applied by us in the text accompanying this footnote.

beyond those related to what is asserted to be a radical change in the neighborhood; they could involve, for example, invidious discrimination that is contrary to public policy. We therefore go on to consider appellants' argument that we should consider the factors prescribed by the Supreme Court of New Jersey in *Davidson Bros. Inc., v. D. Katz & Sons, Inc.*, 579 A.2d 288 (N.J. 1990). Appellants characterize the *Davidson* "reasonableness test" as one that asks whether a restrictive covenant "continues to make sense in light of present commercial, demographic, and other realities," including the uses of property in the surrounding neighborhood. Appellants assert that consideration of the *Davidson* factors would be consistent with the approach of courts in this jurisdiction "to issues of equity and personal liberty."

Of course, this division of the court has no authority to replace our jurisdiction's radical-change doctrine with New Jersey's reworking of that test, and we also may not apply elements of the New Jersey test that would preclude restrictive covenants that our precedents allow or that would otherwise conflict with our precedents. However, subject to those constraints, we go on to consider, in the discussion that follows, whether application of the factors identified in *Davidson* would change the result to which our precedents point.

In *Davidson*, the New Jersey court was asked to consider the enforceability of a restrictive covenant that provided that a property was not to be used as a

supermarket (that could compete with the grantor's store).  *Id.* at 289.[8]  The New Jersey court adopted, and remanded for the trial court to apply, a reasonableness test, explaining that "'reasonableness' is necessarily a fact sensitive issue involving an inquiry into present business conditions and other factors specific to the covenant at issue."  *Id.* at 295.  The court instructed that, in addition to issues of ambiguity or non-ambiguity of the restrictive covenant language and the property purchaser's actual or constructive notice of the restriction, the factors to be considered are: (1) the intention of the parties when the covenant was executed and whether the parties had a viable purpose which did not at the time interfere with existing commercial laws or public policy; (2) whether the covenant had an impact on the consideration paid, "a measure of the value to the parties of the covenant at the time"; (3) whether the covenant is reasonable concerning area, time, or duration (with a caveat that covenants that extend for perpetuity may often be unreasonable); (4) whether the covenant imposes an unreasonable restraint on trade (such as "where there is limited space available to conduct certain business activities"); (5) whether the covenant interferes with the public interest or the public welfare; and

---

[8] The defendant city housing authority alleged that residents of multi-family and senior-citizen housing units near the property were forced to take public transportation and taxis to do grocery shopping because there were no other markets in the area, except for two high-priced convenience stores.  *Id.*  The litigation ensued after the housing authority purchased the property and invited proposals to lease the property to operate a supermarket.  *Id.*

(6) whether, even if the covenant was reasonable at the time it was executed, "changed circumstances" now make the covenant unreasonable. *Id.* The New Jersey court also advised (7) that trial judges might find useful the analogous standard the court had adopted in determining the validity of employee covenants not to compete after termination of employment: i.e., that, generally, enforcement of a covenant is reasonable if it "simply protects the legitimate interests of the employer[,] imposes no undue hardship on the employee, and is not injurious to the public." *Id.* at 296.

We are satisfied that consideration of those *Davidson* factors that we are free to apply would not alter the result we reach through application of the (non-exhaustive) factors identified in our own precedents. To consider each of the *Davidson* factors in turn: (1) There appears to be no dispute that Power Station had a viable and lawful purpose in establishing the restrictive covenant. (2) Appellants do not contest the statement of Power Station's affiant about Power Station's recognition, when it sold the Property, that "including the Restrictive Covenant could reduce the number of potential parties interested in the Property, and, as a result, provide a lower sales or rental price." (3) By its terms, the restrictive covenant is unlimited in duration, but, under *Castleman*, that fact alone does not render it unenforceable. *See* 12 F.2d at 329. (4) By appellants' own account, there are at least eight other nightclubs in the immediate area, and thus no issue of "limited space available to conduct certain business activities." (5) Appellants make no claim

that restricting nightclub use at the Property interferes with the public interest or the public welfare (and to the extent appellants cite lowered District tax revenues and commercial real estate challenges, they have not shown any compelling reason why permitting a nightclub to operate at the property should be favored as a way to address the problem). (6) To the extent appellants have shown changed circumstances (such as a decreased crime rate in the area since the restrictive covenant was established, a claim that appellees assert is undocumented and speculative), they have not shown that such changes are permanent and would endure if nightclub operations resume at the alleyway property (and, in any event, the relevant, and unchanged, circumstances are location vis a vis public roadways, not crime *per se*). And, (7) appellants do not claim that enforcement of the covenant would impose an undue hardship on anyone or injure the public. Appellants fault the Superior Court for granting Power Station's motion for summary judgment when "triable issues of fact have been raised," but their summary judgment opposition was "the proverbial 'put up or shut up' moment," when they were required to "show what evidence [they had] that would convince a trier of fact to accept" their claims. *Center for Inquiry, Inc. v. Walmart, Inc.*, 283 A.3d 109, 123 n.17 (D.C. 2022) (internal quotation marks omitted). They did not do so.

Appellants rely on "unequivocal" findings by the expert ABC Board that the proposed nightclub could be "safely operate[d] . . . without undue impacts to the

neighboring properties" and that its operations "will satisfy the reasonable expectations of residents to be free from disturbances and other nuisances." However, the ABC regulatory scheme recognizes the impermanence of those findings. The legislature has recognized that criminal activity and/or other problems that can render an establishment not "appropriate for the . . . section . . . of the District where it is to be located," D.C. Code § 25-313(a), are subject to change and warrant reexamination of the ABC Board's findings every two years. *Gallothom, Inc. v. D.C. Alcoholic Beverage Control Bd.*, 820 A.2d 530, 533 (D.C. 2003) (noting that "the application of res judicata in administrative decisions is not encrusted with the rigid finality that characterizes the precept in judicial proceedings" (internal quotation marks omitted)). Also, as noted above, the ABC Board declined to consider the impact of the restrictive covenant.

For all the foregoing reasons, we affirm the grant of summary judgment in favor of appellees.

## B.

Finally, we address JPMorgan's appeal of the denial of its motion to intervene. JPMorgan's briefing requests that, in the event we remand to the Superior Court, we also find that JP Morgan should have been permitted to intervene and participate in the litigation. Because we have determined to affirm the grant of summary judgment

to appellees and not to remand, we also affirm the Superior Court's denial of JPMorgan's intervention motion as moot.

* * *

Wherefore, the judgment of the Superior Court is affirmed.

*So ordered.*